# IN THE SUPREME COURT OF CALIFORNIA

TAMARA SKIDGEL,

Plaintiff and Appellant,

v.

CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD,

Defendant and Respondent.

S250149

First Appellate District, Division Five
A151224

Alameda County Superior Court
RG16810609

August 19, 2021

Justice Jenkins authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Cuéllar, Kruger, and Groban concurred.

SKIDGEL v. CALIFORNIA UNEMPLOYMENT
INSURANCE APPEALS BOARD
S250149


Opinion of the Court by Jenkins, J.


The In-Home Supportive Services (IHSS) program (Welf. & Inst. Code, § 12300 et seq.) authorizes certain disabled and elderly Californians to receive in-home services from third parties or family members, paid for with public funds. Under one program option — which we will refer to as the Direct Hiring method — service recipients directly hire their own providers, and the providers are then paid either by the recipients with funds they have received from a public entity or by a public entity itself. We granted review in this case to consider whether, under these circumstances, a provider who is the recipient's minor child, parent, or spouse is covered by the state's unemployment insurance program. The Court of Appeal answered this question in the negative, reasoning that sections 631 and 683 of the Unemployment Insurance Code[1] exclude such a provider from coverage. (*Skidgel v. California Unemployment Ins. Appeals Bd.* (2018) 24 Cal.App.5th 574, 577–578 (*Skidgel*).) For reasons that follow, we agree with the Court of Appeal's conclusion and affirm its judgment.

_____

[1]     All further unlabeled statutory references are to the Unemployment Insurance Code.

## I. FACTUAL AND PROCEDURAL HISTORY

In October 2015, the California Unemployment Insurance Appeals Board (CUIAB) ruled in a Precedent Benefit Decision (PBD) — *In re Caldera* (2015) CUIAB Precedent Benefit Dec. No. P-B-507 — that an IHSS caregiver who was providing services to her son was not entitled to unemployment benefits. It based its conclusion on two provisions of the Unemployment Insurance Code: sections 631 and 683. The former provides: " 'Employment' does not include service performed by a child under the age of 18 years in the employ of his father or mother, or service performed by an individual in the employ of his son, daughter, or spouse, except to the extent that the employer and the employee have, pursuant to Section 702.5, elected to make contributions to the Unemployment Compensation Disability Fund." (§ 631.) The latter states in relevant part that " 'Employer' also means any employing unit which employs individuals to perform" IHSS services, pays at least $1000 in wages for such services during a specified time frame, "and is one of the following: [¶] (a) The recipient of such services, if the state or county makes or provides for direct payment to a provider chosen by the recipient or to the recipient of such services for the purchase of services, subject to the provisions of Section 12302.2 of the Welfare and Institutions Code." (§ 683, subd. (a).) These statutes, the CUIAB reasoned, "confirm that IHSS caregivers who care for their own children are employed by that care recipient with the consequence that the wages earned in that work cannot be used to support a claim for unemployment insurance benefits," regardless of whether some

other entity — such as the state or a county — "might possibly represent an additional employer." (*Caldera*, at p. 4.)

Only one year earlier, the CUIAB had reached the opposite conclusion in a nonprecedential decision, ruling that a woman providing care to her son and receiving direct payments from a public entity qualified for unemployment benefits notwithstanding section 631 based on her joint employment by the public entity. (*In re Ostapenko* (2014) CUIAB Dec. No. AO-336919.) In December 2014, the State Department of Social Services and the Employment Development Department sent letters to the CUIAB disagreeing with *Ostapenko*, asserting that section 631 renders IHSS providers ineligible for unemployment insurance benefits in this context, and urging the CUIAB not to adopt *Ostapenko* as a PBD.

In April 2016, about six months after the CUIAB issued *Caldera*, plaintiff Tamara Skidgel challenged that decision by filing this action under section 409.2, which authorizes interested persons to obtain a judicial declaration as to the validity of a PBD. She alleged the following: She had been an IHSS provider for her daughter since May 2013 and expected to be eligible for unemployment insurance when her employment ended. *Caldera* would "cause [her] to be denied unemployment insurance when her employment . . . ends" because it "held that IHSS providers who provide services for their children . . . are ineligible for Unemployment Insurance." *Caldera* "is invalid" for two reasons: (1) "IHSS providers who provide services for their children . . . are eligible for unemployment insurance under . . . Section 683"; and (2) because such providers have "a joint employer" in addition to the recipient — either "the county" providing the services or "the public authority" that the county

has "establish[ed] and contract[ed] with . . . to provide [those] services" — section 631 "does not preclude them from being eligible for unemployment insurance." Based on a joint record consisting of the comments submitted to the CUIAB and the parties' briefing, the trial court affirmed *Caldera*'s validity and entered judgment for the CUIAB.

The Court of Appeal affirmed, reasoning that "the relevant statutes," though "not patently clear," are "best read[] . . . in light of their plain language and legislative history" as establishing that IHSS recipients are "the sole employers of IHSS providers under" the Direct Hiring method "for purposes of unemployment insurance coverage. It follows that . . . section 631 excludes IHSS providers who serve close-family-member recipients." (*Skidgel, supra*, 24 Cal.App.5th at p. 586, fn. omitted.)

We then granted plaintiff's petition for review.

## II. DISCUSSION

PBDs "are akin to agency rulemaking, because they announce how governing law will be applied in future cases." (*Pacific Legal Foundation v. Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 109 (*Pacific Legal Foundation*).) Accordingly, in declaratory relief actions under section 409.2 challenging PBDs, courts "determine whether the [CUIAB's] decision accords with the law that would govern were the rule announced articulated as a regulation." (*Pacific Legal Foundation*, at p. 111.) "[I]n light of the Board's expertise, its interpretation of a statute [that] it routinely enforces is entitled to great weight . . . ." (*American Federation of Labor v. Unemployment Ins. Appeals Bd.* (1996) 13 Cal.4th 1017, 1027.)

Ultimately, however, "[s]tatutory construction is a matter of law for the courts [citation], and administrative interpretations must be rejected where contrary to statutory intent." (*Pacific Legal Foundation*, at p. 111.) Thus, "[a]lthough" a PBD's interpretation of a statute is entitled to " 'great weight,' " we will not "accept" it "if '[the CUIAB's] application of legislative intent is clearly unauthorized or erroneous.' " (*United Educators of San Francisco etc. v. California Unempl. Ins. Appeals Bd.* (2020) 8 Cal.5th 805, 820.)

The PBD at issue here relates to operation of the unemployment insurance law — principally sections 631 and 683 — in the context of the IHSS program. After summarizing that program and analyzing the relevant statutes within that context, we conclude, like the Court of Appeal, that IHSS caregivers who provide services to a family member specified in section 631 are not eligible for unemployment insurance benefits.

## A. The IHSS Program

IHSS is a social welfare program that, through a combination of state and federal funding, provides in-home supportive care for aged, blind, and disabled persons. (*Reilly v. Marin Housing Authority* (2020) 10 Cal.5th 583, 587–588 (*Reilly*).) It "is specifically 'designed to avoid institutionalization of incapacitated persons.' [Citation.] Providers perform nonmedical supportive services for IHSS recipients, such as domestic services, personal care services, protective supervision, and accompaniment to health-related appointments." (*Id.* at p. 588.) " '[T]he vast majority of home care is provided by family and friends.' " (*Id.* at p. 589.)

"The State Department of Social Services (Department) administers the IHSS program in compliance with state and federal law" and "promulgates regulations to implement the relevant statutes." (*Reilly*, *supra*, 10 Cal.5th at p. 588.) Counties "administer[] the program locally on behalf of the state in accordance with the statutes and state regulations establishing a uniform range of services available to all eligible recipients." (*Service Employees Internat. Union v. County of Los Angeles* (1990) 225 Cal.App.3d 761, 765.) "Each county is obligated to ensure that services are provided to all eligible recipients during each month of the year in accordance with [a] county plan." (Welf. & Inst. Code, § 12302.)

There are several authorized methods through which IHSS providers may be engaged. Counties "may hire" providers "in accordance with established county civil service requirements or" otherwise applicable "merit system requirements." (Welf. & Inst. Code, § 12302.) Counties may also "contract" with individuals and various public and private entities (*ibid.*; see *id.*, § 12301.6, subd. (a)(1)), or "[e]stablish, by ordinance, a public authority to provide for the delivery of" services (*id.*, § 12301.6, subd. (a)(2)). Alternatively, through the Direct Hiring method, providers may be directly "hir[ed]" by recipients (*id.*, § 12304, subd. (a)) and paid either by the recipients with public funds that they receive "in advance" each month (*ibid.*), or by the state or county (*id.*, §§ 12302, 12302.2). In the Direct Hiring context, the State Department of Social Services (Department) is required by statute to "perform or ensure the performance of all rights, duties, and obligations of the recipient relating to those services as required for [various] purposes," including "unemployment compensation,

unemployment compensation disability benefits, [and] workers' compensation." (*Id.*, § 12302.2, subd. (a)(1).)

B. California's Unemployment Insurance Program

Since 1935, when Congress adopted the Social Security Act, "federal law has provided powerful incentives to" states to enact their own unemployment insurance programs. (*City of Sacramento v. State of California* (1990) 50 Cal.3d 51, 58.) California, anticipating the Social Security Act's passage, enacted its own unemployment insurance program in 1935 (Stats. 1935, ch. 352, § 1 et seq.) "and has sought to maintain federal compliance ever since" (*City of Sacramento*, at p. 58). The California program "is part of a national system of reserves designed to provide [benefits] for workers 'unemployed through no fault of their own, and to reduce involuntary unemployment and the suffering caused thereby to a minimum.'" (*American Federation of Labor v. Unemployment Ins. Appeals Bd., supra*, 13 Cal.4th at p. 1024.)

For purposes of coverage, the original 1935 California law first broadly defined "'employment'" to "mean[] any employment by an employer" meeting specified criteria, "under any contract of hire, express or implied, oral or written." (Stats. 1935, ch. 352, § 7, p. 1227.) However, it also expressly excluded several types of work from covered "'employment,'" including, as here relevant, service performed (a) "by an individual in the employ of his son, daughter, or spouse," (b) "by a child under the age of twenty-one in the employ of his father or mother," and (c) "in the employ of a State, a political subdivision" of a state, or "any unit or agency of government." (*Id.*, at p. 1228.)

In 1953, the Legislature repealed the 1935 law and enacted the current Unemployment Insurance Code, with the unemployment insurance program contained in part 1 of division 1.  (Stats. 1953, ch. 308, pp. 1457–1458, 1553.)  In setting forth that program's "Scope or Coverage," the Legislature first broadly defined " 'Employment' " to "mean[] service . . . performed for wages or under any contract of hire, written or oral, express or implied."  (Stats. 1953, ch. 308, § 601, p. 1470 [adding § 601].)  It then limited the scope of coverage by excluding specific services from the definition of "employment."  One excluded service — as specified in section 631 — was "service performed by an individual in the employ of his son, daughter, or spouse, and service performed by a child under the age of 21 in the employ of his father or mother."  (Stats. 1953, ch. 308, § 631, pp. 1473–1474.)  Another generally excluded service — as specified in former section 633 — was "service performed in the employ of a state" or one of its "political subdivisions" or "instrumentalit[ies]."  (Stats. 1953, ch. 308, § 633, p. 1474.)  However, these public entities could, at their *option*, elect to have the services of their employees — other than those "holding civil service or permanent tenure positions" — "constitute employment."[2]  (Stats. 1953, ch. 308, § 709, p. 1479.)

In the almost 70 years since section 631's enactment, the statute has been amended only twice.  In 1971, it was revised in two ways:  (1) the order of the services mentioned was reversed,

---

[2]    Also, "service performed in the employment of a public housing administration agency" was expressly included in the term " '[e]mployment.' "  (Stats. 1953, ch. 308, § 605, p. 1470.)

such that the statute excluded from " 'Employment' . . . service performed by a child under the age of 21 years in the employ of his father or mother, or service performed by an individual in the employ of his son, daughter, or spouse"; and (2) a clause was added to provide, "except to the extent that the employer and the employee have, pursuant to Section 702.5, elected to make contributions to the Unemployment Compensation Disability Fund." (Stats. 1971, ch. 1447, § 1, p. 2858.) The section to which the added clause referred — section 702.5 — was itself a new section enacted through the same legislation, which provided that services excluded by section 631 from the term "employment" would be "deemed to constitute employment" for purposes of unemployment compensation disability benefits upon the filing of "a written election, agreed to by both the employing unit and the individuals in its employ." (Stats. 1971, ch. 1447, § 2, p. 2858.) The purpose and effect of these amendments were to "[p]ermit[] elective disability compensation coverage for individuals in [the] employ of specified relatives." (Legis. Counsel's Dig., Assem. Bill. No. 1420, 3 Stats. 1971 (1971 Reg. Sess.) Summary Dig., p. 213.)

The statute was amended again in 1972, lowering from 21 to 18 the limit on the age of the child whose services were excluded. (Stats. 1972, ch. 579, § 46, p. 1014.) Since then, the statute has provided: " 'Employment' does not include service performed by a child under the age of 18 years in the employ of his father or mother, or service performed by an individual in the employ of his son, daughter, or spouse, except to the extent that the employer and the employee have, pursuant to Section 702.5, elected to make contributions to the Unemployment Compensation Disability Fund." (§ 631.)

The other provision at the center of this dispute — section 683 — was added to the Unemployment Insurance Code in 1978 (Stats. 1978, ch. 463, § 3, p. 1571) and has never been amended. Unlike section 631, which appears in the article entitled "Excluded Services," section 683 appears in the article entitled "Subject Employers." It states in relevant part that " 'Employer' also means any employing unit" that "employs individuals to perform" IHSS services and "is one of the following:  [¶] (a) The recipient . . . if the state or county makes or provides for direct payment to a provider chosen by the recipient or to the recipient . . . for the purchase of services . . . .  [¶] (b) The individual or entity with whom a county contracts to provide in-home supportive services.  [¶] (c) Any county which hires and directs in-home supportive personnel in accordance with established county civil service requirements or merit system requirements for those counties not having civil service systems." (§ 683.)

## C.  The Meaning of the Statutes

"As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose." (*People v. Murphy* (2001) 25 Cal.4th 136, 142.)  "We begin by examining the statutory language, giving it a plain and commonsense meaning. [Citation.]  We do not, however, consider the statutory language in isolation; rather, we look to the entire substance of the statutes in order to determine their scope and purposes. [Citation.]  That is, we construe the words in question in context, keeping in mind the statutes' nature and obvious purposes. [Citation.]   We must harmonize the various parts of the enactments by considering them in the context of the statutory

framework as a whole. [Citation.] If the statutory language is unambiguous, then its plain meaning controls. If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history." (*People v. Cole* (2006) 38 Cal.4th 964, 975.) And, as noted above, the CUIAB's interpretation of a statute "it enforces is entitled to great weight unless clearly erroneous or unauthorized." (*Pacific Legal Foundation*, *supra*, 29 Cal.3d at p. 111.)

According to plaintiff, the language of section 631, construed "[i]n accordance with" its "plain," "usual, [and] ordinary meaning," "does not preclude" coverage of IHSS providers in the Direct Hiring context. She reasons as follows: "The operative phrase" in the statute is " 'in the employ of,' " and that phrase "can [under the law] include joint employment relationships." "Joint employment exists when an employee is subject to the control of two or more employers." In the Direct Hiring context, IHSS providers are "subject to the control of two employers, the recipient and the public entities — the county or the public authority and the state — that have direct control over the manner and payment of work." In addition, because "the state and the county or public authority are intricately involved in paying IHSS providers for their work," "the county and the state [are] employers for [unemployment insurance] purposes" under section 13005, subdivision (a), which provides that " 'Employer' means," among other things and with one specified exception, "the State of California or any political subdivision or agency thereof, . . . or any political body not a subdivision or agency of the state, and any . . . department[] or agency thereof, making payment of wages to employees for

services performed within this state." For these reasons, in the Direct Hiring context, IHSS providers are not only "in the employ of" the recipient for purposes of section 631, they are simultaneously " 'in the employ of' a joint governmental employer." By its terms, section 631 precludes coverage only insofar as eligibility is "based on employment by a spouse or child," i.e., it "excludes only IHSS services performed 'in the employ of' the [provider's] spouse or child." Its exclusion does not apply insofar as eligibility may be "simultaneously . . . based on joint employment by . . . a county or IHSS public authority," i.e., it "allows [coverage] for services performed in the employ of" various public agencies. Thus, "[s]ervice performed [by the IHSS provider] in the employ of [the public agencies] does confer eligibility for unemployment insurance."

Section 683, plaintiff further asserts, confirms and reinforces this reading of section 631. By specifying that the word " 'Employer' *also* means . . . [¶] [t]he recipient of [IHSS] services' " in the Direct Hiring context, section 683 "broadens the definition of 'employer' beyond the general definition[s]" set forth elsewhere in the Unemployment Insurance Code. The section's "plain language" thus makes the IHSS recipient "the employer" of the provider "in addition to the public entity." In this way, the statute "supports a construction of section 631 under which IHSS providers for a spouse or child are eligible for unemployment insurance through their joint employment by a public entity." "In short, [it] is a basis for . . . eligibility in addition to any other bases."

We find plaintiff's dual-employment argument unpersuasive because we agree with the Court of Appeal that the language of section 683, read in context and with reference

12

to the statutory framework of which it is a part, "designate[s] the recipient as the IHSS provider's *sole* employer for purposes of unemployment insurance coverage" in the Direct Hiring context. (*Skidgel, supra,* 24 Cal.App.5th at p. 578.) As the Court of Appeal noted, section 683 "specifically addresses" what the term " ' "Employer" ' " means with respect to "IHSS service delivery." (*Skidgel,* at p. 582.) It sets forth two criteria for defining the term. The first is that the person or entity pays a threshold amount of wages for IHSS services: $1,000 "during any calendar quarter in the calendar year or the preceding calendar year." (§ 683). The second criterion is that the person "is *one of the following*: [¶] (a) The recipient of such services, if the state or county makes or provides for direct payment to a provider chosen by the recipient or to the recipient of such services for the purchase of services, subject to the provisions of Section 12302.2 of the Welfare and Institutions Code. [¶] (b) The individual or entity with whom a county contracts to provide in-home supportive services. [¶] (c) Any county which hires and directs in-home supportive personnel in accordance with established county civil service requirements or merit system requirements for those counties not having civil service systems." (§ 683, italics added.) Notably, when the Legislature enacted section 683 in 1978, these three options precisely tracked the three ways that counties were authorized by statute to carry out their duties regarding the provision of IHSS services: (1) "make direct payment to a recipient for the purchase of services"; (2) "contract with" specified entities or an individual; or (3) "hire" providers "in accordance with established county civil service requirements or merit system

requirements for those counties not having civil service."[3] (Welf. & Inst. Code, § 12302; see Stats. 1977, ch. 1252, § 813, p. 4662.) In other words, section 683, after specifying that " 'Employer' also means" an "employing unit" that "*is one of the following*," designates *one* person or entity for each of the three ways through which IHSS providers could, at the time of the statute's enactment, be engaged. In light of this statutory context, we agree with the Court of Appeal that "the most natural reading" of section 683 is that it modifies the general definition of "employer" for purposes of the Unemployment Insurance Code by specifying, with respect to the provision of IHSS services, who the *sole* employer is for each method of engaging providers. (*Skidgel, supra*, 24 Cal.App.5th at p. 586.) In the Direct Hiring context — i.e., where "the state or county makes or provides for direct payment to a provider chosen by the recipient or to the recipient of such services for the purchase of services" — that sole employer is "[t]he recipient of such services." (§ 683, subd. (a).)

Supporting this conclusion is the fact that section 683, subdivision (a) makes the designation of the recipient as employer in the Direct Hiring context expressly "subject to the provisions of Section 12302.2 of the Welfare and Institutions Code." The latter section specifies that in the Direct Hiring context — i.e., when "the state or a county makes or provides

---

[3] It was not until 1992 that the Legislature first passed a statute authorizing counties to "[e]stablish, by ordinance, a public authority to provide for the delivery of" IHSS services. (Stats. 1992, ch. 722, § 54, p. 3411 [Welf. & Inst. Code, former § 12301.6, subd. (a)(2)].) We discuss the effect of that statute later in this opinion.

for direct payment to [an IHSS] provider chosen by a recipient or to the recipient for the purchase of in-home supportive services" — the state, acting through the Department, "shall perform or ensure the performance of all rights, duties, and obligations *of the recipient* relating to [IHSS] services as required for [various] purposes," including "unemployment compensation." (Welf. & Inst. Code, § 12302.2, subd. (a)(1), italics added.) It also specifies that "[t]hose rights, duties, and obligations include . . . withholding . . . amounts to be withheld from the wages of the provider *by the recipient as an employer*, . . . and transmitting those amounts along with amounts required for all contributions, premiums, and taxes payable *by the recipient as the employer* to the appropriate person or state or federal agency." (*Ibid.*, italics added.)

Several things are evident from these statutes read together. First, in the Direct Hiring context, the only designated employer is "[t]he recipient of [IHSS] services." (§ 683, subd. (a).) Second, where a county contracts for the provision of services, the only designated employer is "[t]he individual or entity with whom [the] county contracts." (*Id.*, subd. (b).) Third, where a county "hires and directs in-home supportive personnel in accordance with established county civil service requirements or merit system requirements," the only designated employer is the county. (*Id.*, subd. (c).) Fourth, the state is not designated as employer in any of the IHSS scenarios. Instead, its expressly designated role is to "perform or ensure the performance of all rights, duties, and obligations" that otherwise would be the legal responsibility "*of the recipient*" in the Direct Hiring context, including the duties of "*the recipient as an employer*" to withhold specified amounts "from the wages of the provider" and to

15

"transmit[] those amounts along with amounts required for all contributions, premiums, and taxes payable by *the recipient as the employer* to the appropriate person or state or federal agency." (Welf. & Inst. Code, § 12302.2, subd. (a)(1), italics added.) These provisions send the message that in the Direct Hiring context, the recipient is the *sole* employer, with the recipient's legal duties as employer being the responsibility of the state. They foreclose plaintiff's view that a public entity is simultaneously an employer in this context.

Relevant extrinsic sources confirm our interpretation. According to the legislative history of section 683 and Welfare and Institutions Code section 12302.2 — which the Legislature simultaneously enacted through passage of a single bill — eligibility for unemployment insurance and workers' compensation benefits was expanded during the 1970s to include domestic employees, including IHSS providers. (Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 3028 (1977–1978 Reg. Sess.) July 13, 1978, p. 1.) As to IHSS providers hired and paid directly by recipients, "it [was] not clear who [was] the 'employer' for the purposes of these programs" (Sen. Industrial Relations Com., Analysis of Assem. Bill No. 3028 (1977–1978 Reg. Sess.) as amended June 8, 1978, p. 2), with courts and enforcement agencies holding counties liable as "employers" (Health & Welf. Agency, Employment Development Dept., Enrolled Bill Rep. on Assem. Bill No. 3028 (1977–1978 Reg. Sess.) July 10, 1978, p. 1) based on the "considerable control" they exercised "by providing the wages and determining the level of service and number of hours to be worked" (Sen. Industrial Relations Com., Analysis of Assem. Bill No. 3028 (1977–1978 Reg. Sess.) as amended June 8, 1978, p. 2). There

was concern that counties, "in order to avoid paying" benefit costs "as the employer," would abandon the Direct Hiring method and use other, far more expensive "delivery methods" — hiring IHSS providers as "county civil service employees" and engaging "contract providers" — that would cost the state, respectively, "an additional" $80 million and $116 million per year. (Health & Welf. Agency, Dept. of Social Services, Enrolled Bill Rep. on Assem. Bill No. 3028 (1977–1978 Reg. Sess.) July 7, 1978, p. 2.)

The Legislature sought to address this concern through the 1978 legislation, by enacting several provisions — including section 683 and Welfare and Institutions Code section 12302.2 — to establish a less "expensive option" that would "save[] the State from having to assume" these increased costs. (Assem. Ways and Means Com., Staff Analysis of Assem. Bill No. 3028 (1977–1978 Reg. Sess.) as amended June 8, 1978, pp. 1–2.) The statutes were intended to achieve this goal by "resolv[ing] the [question] of who is the employer of" IHSS providers "selected by . . . recipients" in the following way: "designating the recipient[s] as the employer . . . , requiring the State to assure collection and payment of all contributions through a payrolling system, and requiring the State to pay the employer's share of mandated benefits." (Health & Welf. Agency, Dept. of Social Services, Enrolled Bill Rep. on Assem. Bill No. 3028 (1977–1978 Reg. Sess.) July 7, 1978, p. 2; see Sen. Industrial Relations Com., Analysis of Assem. Bill No. 3028 (1977–1978 Reg. Sess.) as amended June 8, 1978, pp. 2, 3 [legislation "would specify that the recipient of . . . services is the 'employer' of the provider" in the Direct Hiring context, with "the state . . . assum[ing] the cost of the recipients' share of the

taxes and premiums for these programs" and the department "responsible for performing, or assuming performance by contract, the recipients['] rights, duties and obligations under these programs"].)  Although these provisions were expected to increase the state's annual costs by approximately $13 million, compared to the alternatives, they would actually "save the State either $67 million or $103 million" annually. (Assem. Ways and Means Com., Staff Analysis of Assem. Bill No. 3028 (1977–1978 Reg. Sess.) as amended June 8, 1978, p. 2.)  In short, as plaintiff explains, the legislative history "shows" that the Legislature enacted section 683, in conjunction with Welfare and Institutions Code section 12302.2, in order "to relieve the state of the $103 million burden it [c]ould face" if counties abandoned the Direct Hiring method to avoid the costs they would incur "if . . . found to be employers of IHSS providers" in this context.  The statutes accomplish this cost-savings purpose by making recipients the *sole* employer in the Direct Hiring context and shifting the costs of unemployment insurance to the state.  Plaintiff's contrary reading of the statutes — that they make recipients employers *in addition to* counties and other public entities — could defeat this purpose and *perpetuate* the very problem the Legislature sought to solve.

Section 683's failure to mention public authorities — which plaintiff asserts are also joint employers — does not affect our conclusion.  This silence is not surprising given that the Legislature enacted section 683 14 years before adding a provision regarding public authorities in the IHSS context. (See Stats. 1992, ch. 722, § 54, p. 3411.)  Moreover, the text of the later-added provision on public authorities — Welfare and Institutions Code section 12301.6, subdivision (a)(2) — suggests

a legislative intent to preserve section 683's operation in the Direct Hiring context.  The statute identifies two "mode[s]" by which public authorities may "provid[e] for the delivery of" IHSS services — "by contract in accordance with [Welfare and Institutions Code] Sections 12302 and 12302.1" and "by direct payment to a provider chosen by a recipient in accordance with [Welfare and Institutions Code] Sections 12302 and 12302.2" — and specifies that public authorities "shall comply with and be subject to, all statutory and regulatory provisions applicable to the respective delivery mode."  (Welf. & Inst. Code, § 12301.6, subd. (d).)  The statutory "provisions applicable to" the Direct Hiring mode — and that public authorities are thus made "subject to" (*ibid.*) —  include:  (1) section 683, subdivision (a), which, as earlier explained, designates "[t]he recipient" as employer in this context; and (2) Welfare and Institutions Code section 12302.2, which, as earlier explained, directs the state, through the department, to "perform or ensure the performance of" (*id.*, subd. (a)(1)) various duties and obligations "on the recipient's behalf as the employer" (*id.*, subd. (a)(2)) or "as an employer" (*id.*, subd. (c)).  Indeed, "the state's responsibility" to perform the duties of the recipient as employer is expressly preserved by Welfare and Institutions Code section 12301.6, subdivision (i)(1), which provides:  "This section does not affect the state's responsibility with respect to the state payroll system, unemployment insurance, or workers' compensation and other provisions of [Welfare and Institutions Code] Section 12302.2."  These provisions indicate that the Legislature, in authorizing counties to establish public authorities, intended to preserve section 683's designation of the recipient as the sole employer in the Direct Hiring context.

The legislative history of Welfare and Institutions Code section 12301.6 is consistent with this conclusion.  In 1996, the Legislature amended that statute in several ways, including the following:  (1) specifying in subdivision (b)(2)(B) that a public authority "shall be," among other things, an entity "that makes or provides for direct payment to a provider chosen by the recipient for the purchase of services pursuant to Sections 12302 and 12302.2" (Stats. 1996, ch. 206, § 22, p. 1674); (2) specifying in subdivision (c)(1) that "[r]ecipients shall retain the right to hire, fire, and supervise the work of any [IHSS] personnel providing services to them"; and (3) adding subdivision (d) to specify that public authorities, "when providing for the delivery of services . . . by contract" or "by direct payment to a provider chosen by a recipient," "shall comply with and be subject to, all statutory and regulatory provisions applicable to" those "delivery mode[s]"  (Stats. 1996, ch. 206, § 22, p. 1675).  According to the legislative history, these provisions had the following purposes:  (1) "[c]larif[ying]" that public authorities "have the ability to administer the county Individual Provider mode" (Dept. of Finance, Enrolled Bill Rep. on Sen. Bill No. 1780 (1995–1996 Reg. Sess.) July 9, 1996, p. 6); (2) "[r]equir[ing]" public authorities "to adhere to the current state statutory and regulatory requirements, regardless of which mode is administered by" the public authority (*ibid.*); (3) preserving "the state's responsibility with respect to the state payroll system, unemployment insurance or workers compensation" (*ibid.*); and (4) "mak[ing] clear that providers in a Public Authority (PA) county remain Individual Providers (IPs) in the IP Mode, with the PA administering the IP Mode," in order to prevent such providers from being classified as "employees of the PA" in this

mode (Health & Welf. Agency, Dept. of Social Services, Enrolled Bill Rep. on Sen. Bill No. 1780 (1995–1996 Reg. Sess.) July 16, 1996, p. 7). These statements, like the text of Welfare and Institutions Code section 12301.6, are consistent with the conclusion that the Legislature, while authorizing counties to establish public authorities, intended to preserve section 683's designation of the recipient as the sole employer in the Direct Hiring context.

Plaintiff puts forth several textual arguments in support of her contrary reading of the statutes, but none proves persuasive. As noted earlier, regarding section 683, she focuses on a single word in the statute — "also" — which, she asserts, "[d]ictionaries define . . . as 'in addition.' " But this approach to interpreting the statute — "isolat[ing] one word and ignor[ing] the rest of the language" — "is contrary to bedrock principles of statutory construction." (*Franchise Tax Bd. v. Superior Court* (2013) 221 Cal.App.4th 647, 667.) As we have explained, "[t]he interpretation of a statute . . . should not end . . . with a dictionary definition of a single word used therein." (*Pearson v. State Social Welfare Bd.* (1960) 54 Cal.2d 184, 194.) Instead, to interpret a statute, we consider *all* of its language "in context" and with reference to "provisions relating to the same subject" and "the whole system of law of which [the statute] is a part." (*People v. Anderson* (2002) 28 Cal.4th 767, 776.) For reasons already explained, we conclude that the language of section 683, read in context and in light of its legislative history, makes the recipient the sole employer in the Direct Hiring context, rather than an employer *in addition to* a public agency, as plaintiff asserts.

Related provisions defining the term "employer" for purposes of the Unemployment Insurance Code cast further doubt on plaintiff's heavy reliance on the word "also" in section 683's opening phrase, " 'Employer' *also* means." (Italics added.) That same phrase appears throughout the article of the Unemployment Insurance Code that contains section 683 — article 3 of division 1, part 1, chapter 3 — which is entitled "Subject Employers." (§§ 676, 677, 682, 684–686.) In each instance, it appears to reference the general definition of employer set forth in the first section of the article, section 675: " 'Employer' means any employing unit, which for some portion of a day, has within the current calendar year or had within the preceding calendar year in employment one or more employees and pays wages for employment in excess of one hundred dollars ($100) during any calendar quarter." Viewed in this context, the phrase "also means" in section 683 appears to signal *a refinement*, for purposes of applying the Unemployment Insurance law in the IHSS context, of the general definition appearing at the beginning of the article, rather than a considered legislative choice to *expand* the definition by designating *additional* employers in that context. This understanding of the phrase, unlike plaintiff's, is fully consistent with section 683's purpose, as disclosed by the legislative history previously discussed.

This analysis also answers plaintiff's related textual argument that our reading of section 683 renders "meaningless" the word "also" in the statute's opening phrase, and thus contravenes the interpretive canon directing courts to " 'give meaning to every word of a statute if possible, and [to] avoid a construction making any word surplusage.' " As just discussed,

under our construction of the statute, the word "also" in section 683's opening phrase signals that the statute sets forth refinements to — i.e., *additional* components of — what the term " 'Employer' . . . means" (*ibid.*) in the IHSS context. Our construction *does*, in fact, give meaning to the word "also," just not the meaning plaintiff proffers. In any event, "the canon against surplusage is [merely] a guide to statutory interpretation and is not invariably controlling." (*People v. Valencia* (2017) 3 Cal.5th 347, 381.) We will not use it "to defeat legislative intent" as gleaned from available sources, including the rest of the words in the statute, related statutes, the "legislative history and the 'wider historical circumstances' of the enactment." (*People v. Cruz* (1996) 13 Cal.4th 764, 782, 783.) As already explained, it would defeat the Legislature's intent to adopt plaintiff's view that the word "also" in section 683's opening phrase means that the statute designates the recipient as the employer in the Direct Hiring context *in addition to* a public entity.

Plaintiff also offers several arguments based on the language of Welfare and Institutions Code section 12302.2, but none is persuasive. She first emphasizes the fact that the statute twice refers to the recipient as "*an* employer" (*id.*, subds. (a)(1) & (c), italics added) and argues that "the word 'an,' " like the word "also" in section 683, "contemplates more than one employer." However, the statute alternatively refers several times to the recipient as "*the* employer," once in a sentence that also contains the phrase "an employer." (Welf. & Inst. Code, § 12302.2, subd. (a)(1), (2), italics added.) As the Court of Appeal concluded, in light of this circumstance, the statute's use of the phrase "an employer" "reveal[s] little about the Legislature's

intent." (*Skidgel*, *supra*, 24 Cal.App.5th at p. 580, fn. 5.) Plaintiff candidly acknowledges the "uncertainty" arising from the statute's use of these alternative phrases, but she then errs by arguing that this uncertainty "is not otherwise resolved." As earlier explained, the cost-savings purpose of the legislation through which Welfare and Institutions Code section 12302.2 — in tandem with section 683 — was enacted is only achieved by interpreting the statutes as making recipients the *sole* employer in the Direct Hiring context. As also earlier explained, plaintiff's contrary reading of the statutes — that they make recipients employers in addition to counties — could defeat this purpose and perpetuate the very problem the Legislature sought to solve.

Nor are we persuaded by plaintiff's argument that because Welfare and Institutions Code section 12302.2, subdivision (a)(1), "require[s] the state to make" unemployment insurance contributions in the Direct Hiring context "for all IHSS providers without exception," it would "def[y] reason" to read section 683 as "mak[ing] a large class of those workers ineligible to receive [the] benefits for which those contributions are made." The language of Welfare and Institutions Code section 12302.2, subdivision (a)(1) simply fails to support the premise of plaintiff's argument: that the state must make unemployment insurance contributions as to IHSS workers providing services that section 631 excludes from " '[e]mployment.' " As here relevant, the text of that subdivision requires the state to perform the "duties" and "obligations of the recipient relating to those services as required for purposes of unemployment compensation," including the making of "contributions . . . payable by the recipient as the employer." (Welf. & Inst. Code,

§ 12302.2, subd. (a)(1).) A separate subdivision addresses payment of "[c]ontributions . . . resulting from liability incurred by the recipient as employer for unemployment compensation." (*Id.*, subd. (a)(3).) As to services that section 631 excludes from " 'Employment,' " there are no "contributions . . . payable by the recipient as the employer" or other "duties" or "obligations of the recipient . . . required for purposes of unemployment compensation." (Welf. & Inst. Code, § 12302.2, subd. (a)(1).) Nor is any "liability incurred by the recipient as employer for unemployment compensation." (*Id.*, subd. (a)(3).) Unlike plaintiff, we therefore find nothing unreasonable — or even arguably anomalous — about reading section 683 to exclude certain IHSS providers from the unemployment compensation program, notwithstanding the state's duty under Welfare and Institutions Code section 12302.2 to make unemployment insurance contributions for IHSS providers in the Direct Hiring context.

We also reject a third argument plaintiff makes based on Welfare and Institutions Code section 12302.2: that the state's " 'payroll function' " under that section — "handl[ing] payroll deductions, which includes deducting for" unemployment insurance — "makes . . . the state [an] employer[] for [unemployment insurance] purposes" under section 13005, which states in relevant part that " 'Employer' means . . . the State of California or any" of its political subdivisions, agencies, and departments, "making payment of wages to employees for services performed within this state." As explained above, in performing its duties under Welfare and Institutions Code section 12302.2, the state is carrying out the "duties" and "obligations of the recipient . . . as the employer" (*id.*, subd.

(a)(1)). Indeed, the statute expressly specifies that in paying or transmitting "[c]ontributions, premiums, and taxes," the state is acting "on the recipient's behalf as the employer" (*id.*, subd. (a)(2)) or "as an employer" (*id.*, subd. (c)), and not as an employer in its own right.

Section 13005 does not alter this conclusion. It appears in division 6 of the Unemployment Insurance Code, which is entitled "Withholding Tax on Wages," not in the division of the code — division 1 — that contains sections 631 and 683 and is entitled "Unemployment and Disability Compensation." Nothing suggests that section 13005's definition of "employer" applies outside of division 6 or that the Legislature intended or understood that it would. In fact, both division 1 and division 6 contain provisions suggesting precisely the contrary. Section 125, which is part of division 1, states, "Except where the context otherwise clearly indicates, the definitions set forth in this article shall govern the construction of the provisions of this division." Division 6 contains a similar limiting provision — section 13003, subdivision (a) — which states in relevant part, "Except where the context otherwise requires, the definitions set forth in this chapter . . . shall apply to and govern the construction of this division." Given that division 1 contains a separate article — article 3 of part 1, chapter 3 — that defines the term "employer" for purposes of unemployment compensation, and that section 683 of article 3 specifically addresses the meaning of that term in the circumstances of this case, "the context" here (§§ 125, 13005, subd. (a)) neither "requires" (§ 13005, subd. (a)) us to apply the definition in division 6, nor "clearly indicates" (§ 125) that it would be

appropriate for us to do so. For these reasons, plaintiff's reliance on section 13005 is unpersuasive.

We find plaintiff's remaining arguments also unconvincing. In urging us to interpret the statutes to provide coverage, plaintiff invokes the rule of liberal construction, which generally directs courts to "liberally construe[]" provisions of the Unemployment Insurance Code "to further the legislative objective of reducing the hardship of unemployment." (*Sanchez v. Unemployment Ins. Appeals Bd.* (1984) 36 Cal.3d 575, 584.) "[I]t is true" that the provisions here at issue, as "remedial" statutes, "should be liberally construed so as to afford all the relief" that their "language . . . indicates . . . the Legislature intended to grant." (*Cal. Emp. Com. v. Kovacevich* (1946) 27 Cal.2d 546, 549.) But the construction we adopt "should not exceed the limits of the statutory intent." (*Id.* at p. 550.) Because " 'the purpose of' " the liberal construction rule " 'is to effectuate . . . legislative intent,' " courts " ' "should not blindly . . . follow[] [the rule] so as to eradicate the [legislation's] clear language and purpose." ' " (*City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 472 [involving pension legislation].) Thus, we may not apply the rule to " 'enlarge[] or restrict[]' " a statute's "evident meaning" (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 844), to " ' "allow eligibility for those for whom it was obviously not intended" ' " (*City of Huntington Beach*, at p. 472), "to defeat the overall statutory framework or to disregard the legislative intent" (*Massey v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 674, 686). "Because," as explained above, the relevant "legislative history" shows that plaintiff's reading of the statutes would restrict their

evident meaning, disregard the Legislature's intent, defeat the overall statutory framework, and extend coverage to those for whom it obviously was not intended, adopting that reading " 'would [impermissibly] rewrite the statute[s] in the guise of [liberally] construing' " them. (*Justus v. Atchison* (1977) 19 Cal.3d 564, 580.)

Nor does plaintiff's reliance on *In-Home Supportive Services v. Workers' Comp. Appeals Bd.* (1984) 152 Cal.App.3d 720 (*In-Home*) alter our conclusion. There, the court held that IHSS providers who would be excluded by statute from workers' compensation coverage based on their employment relationship with recipients are nevertheless eligible for workers' compensation benefits because "the state is also the employer of" such providers and "[t]he workers' compensation law provides for coverage based upon dual employment relationships." (*Id.* at p. 725.) In reaching this conclusion, the court rejected the argument that in the Direct Hiring context, the recipient is the provider's sole employer by virtue of Labor Code section 3351.5, subdivision (b), which first states that the term " 'Employee' includes" those "who perform[] domestic" IHSS services, and then states that "[f]or purposes of" applying the workers' compensation scheme's statutory *exclusions*, any "such person shall be deemed an employee of the recipient of such services . . . if the state or county makes or provides for direct payment to such person or to the recipient of in-home supportive services for the purchase of services, subject to the provisions of Section 12302.2 of the Welfare and Institutions Code." (See *In-Home*, at pp. 734–740.) This decision, plaintiff argues, shows that "IHSS providers . . . are jointly employed by the public agencies and the IHSS recipient," and that a "single

[coverage] exclusion" based on a provider's employment relationship with one employer — the recipient — "should not necessarily apply to all employers."

For several reasons, *In-Home* is distinguishable. Although the statute there at issue — Labor Code section 3351.5, subdivision (b) — and section 683 bear *some* linguistic similarities, they are different in important ways. Section 683 is part of an article entitled "Subject Employers" and defines what the term " 'Employer' . . . means" in the IHSS context, whereas Labor Code section 3351.5, subdivision (b), is part of an article entitled "Employees" and sets forth what the term " 'Employee' includes." The latter statute declares that, for purposes of workers' compensation, the IHSS provider "shall be deemed *an* employee of the recipient" in the Direct Hiring context. (Lab. Code, § 3351.5, subd. (b), italics added.) The *In-Home* court, in reaching its conclusion, "emphasized" the statute's use of the indefinite article " '*an*,' " reasoning that the statute says "not [that] the IHSS recipient is '*the only*' employer of the IHSS worker," but that "the recipient is '*an*' employer of the worker." (*In-Home*, *supra*, 152 Cal.App.3d p. 740, fn. 26.) By contrast, as explained above, section 683 first specifies that " 'Employer' also means" an "employing unit" that "*is one of the following*," and then designates *one* person or entity for each of the three ways through which IHSS providers could, at the time of the statute's enactment, be engaged: "[t]he recipient" in the Direct Hiring context, "[t]he individual or entity with whom a county contracts to provide" IHSS services, or the "county" when it hires providers "in accordance with" civil service or merit system requirements. (*Id.*, subds. (a), (b), (c), italics added.) In light of these functional, structural, and linguistic differences,

*In-Home*'s interpretation of Labor Code section 3351.5, subdivision (b) in the context of the workers' compensation scheme offers little, if any, help in interpreting the meaning of section 683 in the context of the unemployment insurance scheme.

Finally, we address plaintiff's assertion that weighty "policy" considerations warrant adopting her reading of the statutes. In her view, the cost of adopting the CUIAB's statutory construction — denying coverage to "approximately 135,000" IHSS providers who care for family members — cannot be "justif[ied]" in terms of section 631's "core purpose," i.e., "prevent[ing] collusion between family members to obtain unemployment insurance." Public entities, she asserts, have numerous "means . . . to prevent and detect collusive fraud" and "to take action if" any is suspected. By statute, they have "substantial control over hiring through background checks and required orientation"; they "alone[] fix[] the terms and conditions of employment," including the tasks providers may perform and the time allowed for each task; they "enforce[] overtime restrictions through audits and fraud investigations"; and they "impos[e] penalties for violations, including barring providers from employment for" extended periods of time and "terminating . . . persistent violator[s] from" the IHSS program "altogether." According to plaintiff, because "the Legislature has provided these means for" public entities to prevent and detect collusion and "to nip . . . in the bud" any that occurs, section 631's "anti-fraud purpose" can be served without construing it to "single[] out family member IHSS providers and, in Draconian fashion, wholly exclude[] them from unemployment insurance."

Although we appreciate the significance of plaintiff's policy arguments, they do not overcome the statutes' evident meaning. Where "statutory language and legislative history are unclear" (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1042), "[p]olicy considerations may of course be useful in interpreting" a statute (*Taylor v. Board of Trustees* (1984) 36 Cal.3d 500, 509, fn. 9). "[B]ut it is the *Legislature's* policy that ultimately must control, and in determining that policy we must pay heed to available evidence of legislative intent," including "the history of the pertinent statutes." (*Ibid.*) Where "the application of firmly established rules of statutory construction" establish a statute's meaning, we "may not rest" our decision "on the weighing and balancing of public policy considerations." (*Torres v. Automobile Club of So. California* (1997) 15 Cal.4th 771, 782.) Because, as explained above, "the statutory language, purpose, and context all point to [our] interpretation," plaintiff's argument that the statutes could or "should have been written differently [is] more appropriately addressed to the Legislature." (*Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 90, fn. 6.) That lawmaking branch of government, "which can study the various policy and factual questions and decide what rules are best for society" (*Carrisales v. Department of Corrections* (1999) 21 Cal.4th 1132, 1140), can consider plaintiff's view that denying unemployment insurance benefits to close family caregivers comes at a steep cost: leaving people who have cared for their disabled family members — often forgoing better paying and less demanding employment — without a safety net

when their family members die or can no longer safely be cared for at home.[4]

Indeed, the Legislature has, in fact, been focused on this very issue in recent years. In 2016, it passed a bill establishing an advisory committee to, among other things, recommend "steps the state can take to ensure that all IHSS providers who provide supportive services to a spouse or child have access to employment-based supports and protections, including . . . state unemployment insurance benefits." (Assem. Bill No. 1930 (2015–2016 Reg. Sess.) § 1, as enrolled Aug. 25, 2016.) Last year, it passed a bill amending section 631 to specify that "for purposes of unemployment benefits under this part, 'employment' includes services performed by an individual in the employ of their father or mother, or service performed by an individual in the employ of their son, daughter, or spouse, if that individual is providing services through the [IHSS] program …." (Assem. Bill No. 1993 (2019–2020 Reg. Sess.) § 1, as enrolled Sept. 1, 2020.) The Governor vetoed both bills. The CUIAB argues that these measures and their legislative histories confirm that "close-family IHSS providers are not eligible for unemployment insurance benefits" under current law. Plaintiff responds that the material is irrelevant because (1) the Legislature's recently expressed views on the meaning of section

---

[4] We note that our conclusion is consistent not only with *Caldera*, but also, as earlier discussed, with the position communicated to the CUIAB by the Employment Development Department and the Department of Social Services in connection with *Ostapenko*. Thus, our decision is unlikely to take unemployment insurance benefits away from anyone currently receiving them.

631, which was last amended in 1972, "is of little use, if any"; and (2) "no inferences can be drawn from vetoed legislation." We need not — and do not — address these arguments because the language of the existing statutes, read in light of their legislative histories and the statutory scheme as a whole, resolves the case. We simply note these legislative developments to show that the Legislature — which is the branch of our government "charged . . . with 'mak[ing] law . . . by statute' " (*People v. Bunn* (2002) 27 Cal.4th 1, 14) — has very recently been "weigh[ing]" the "competing interests" and considering what "social policy" should be in this area (*Bunn,* at p. 15).[5]

In light of our analysis, we also need not resolve the parties' disagreement about the weight or deference to which the CUIAB's position, as set forth in the PBD, is entitled. As earlier noted, as a general principle, when a court reviews a PBD, the agency's "view of a statute [that] it enforces is entitled to great weight unless clearly erroneous or unauthorized." (*Pacific Legal Foundation*, *supra*, 29 Cal.3d at p. 111.) Plaintiff argues that the PBD here is "entitled to [no] deference" because the CUIAB's position on the coverage question in this case has been "inconsistent" and "vacillating," with the agency reaching "the opposite conclusion in *Ostapenko*" just "a year prior to" issuing the PBD. The CUIAB responds that the inconsistency is irrelevant because *Ostapenko* was the decision of an

---

[5]     Pending in the Legislature is a bill, introduced a few months after the Governor's second veto, that would amend section 631 only by changing the phrases "his father" and "his son" to "their father" and "their son." (Assem. Bill No. 330 (2021-2022 Reg. Sess.) § 1, as introduced Jan. 27, 2021.)

"individual Appeals Board panel[]," whereas the PBD we are reviewing, like all PBDs, was "a decision of the Board 'acting as a whole' . . . after a full and public process, with input from stakeholders and other entities with relevant experience and expertise." Because our conclusion that section 631's exclusion applies in the Direct Hiring context is consistent with the PBD and follows from the language and structure of the statutory scheme, viewed in light of relevant legislative history, we need not further discuss the deference question.

## III. DISPOSITION

For the reasons set forth above, we affirm the Court of Appeal's judgment.

**JENKINS, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Skidgel v. California Unemployment Insurance Appeals Board

———————————————————————————————

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 24 Cal.App.5th 574
**Review Granted (unpublished)**
**Rehearing Granted**

———————————————————————————————

**Opinion No.** S250149
**Date Filed:** August 19, 2021

———————————————————————————————

**Court:** Superior
**County:** Alameda
**Judge:** Robert B. Freedman

———————————————————————————————

**Counsel:**

Legal Services of Northern California, Stephen E. Goldberg, Wade Askew; Downey Brand and Jay-Allen Eisen for Plaintiff and Appellant.

Carole Vigne, Katherine Fiester; Rothner, Segall & Greenstone, Anthony R. Segall, Hannah Weinstein; Anna Kirsch; Jenna Lauter Miara; Daniela Urban; Anthony Mischel, Catherine Ruckelhaus and Nayantara Mehta for Bet Tzedek, Center for Workers' Rights, Legal Aid at Work, National Employment Law Project, United Domestic Workers of America, AFSCME Local 3930, AFL-CIO and Women's Employment Rights Clinic of Golden Gate University School of Law as Amici Curiae on behalf of Plaintiff and Appellant.

Laurel R. Webb for Service Employees International Union Local 2015 as Amicus Curiae on behalf of Plaintiff and Appellant.

Xavier Becerra, Attorney General, Edward DuMont and Michael J. Mongan, State Solicitors General, Janill L. Richards, Principal Deputy

State Solicitor General, Julie Weng-Gutierrez and Cheryl L. Feiner, Assistant Attorneys General, Susan M. Carson, Gregory D. Brown and Hadara R. Stanton, Deputy Attorneys General, for Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Stephen E. Goldberg
Legal Services of Northern California
517 12th Street
Sacramento, CA 95814
(916) 551-2181

Janill L. Richards
Principal Deputy State Solicitor General
1515 Clay Street, 20th Floor
Oakland, CA 94612
(510) 879-0958