# IN THE SUPREME COURT OF CALIFORNIA

TANIA PULLIAM,

Plaintiff and Respondent,

v.

HNL AUTOMOTIVE INC. et al.,

Defendants and Appellants.

S267576

Second Appellate District, Division Five
B293435

Los Angeles County Superior Court
BC633169

May 26, 2022

Justice Liu authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Kruger, Groban, Jenkins, and Robie[*] concurred.

---

[*]     Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PULLIAM v. HNL AUTOMOTIVE INC.

S267576


Opinion of the Court by Liu, J.


The Federal Trade Commission's "Holder Rule" requires consumer credit contracts to include specific language permitting a consumer to assert against third party creditors all claims and defenses that could be asserted against the seller of a good or service. (16 C.F.R. § 433.2(a) (1975).) The required notice further states that "recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder." (*Ibid.*, capitalization omitted here and hereafter.)

Tania Pulliam (Pulliam) purchased a used vehicle from HNL Automotive Inc. (the dealership) pursuant to an installment sales contract that included this notice. The contract was subsequently assigned to TD Auto Finance (TDAF; now merged into TD Bank), which became the "holder" of the contract. (*Pulliam v. HNL Automotive Inc.* (2021) 60 Cal.App.5th 396, 402 (*Pulliam*).) Pulliam filed suit against the dealership and TDAF alleging misconduct by the dealership in the sale of the car. A jury found for Pulliam on one of her causes of action — breach of the implied warranty of merchantability under the Song-Beverly Consumer Warranty Act (Song-Beverly Act; Civ. Code, § 1790 et seq.) — and awarded her $21,957.25 in damages. Pulliam filed a posttrial motion seeking attorney's fees in the amount of $169,602 under the Song-Beverly Act. (See Civ. Code, § 1794, subd. (d).) TDAF argued that it could not be liable for attorney's fees based on the provision of the Holder Rule limiting recovery to the "amount[] paid by the debtor"

under the contract. (16 C.F.R. § 433.2(a) (1975).) The trial court disagreed and granted Pulliam's motion. The Court of Appeal affirmed. (*Pulliam*, at p. 401.)

We granted review to address whether "recovery" under the Holder Rule (hereafter sometimes Rule) includes attorney's fees and limits the amount of fees plaintiffs can recover from holders to amounts paid under the contract. The Courts of Appeal are divided on this issue. (Compare *Pulliam*, *supra*, 60 Cal.App.5th at p. 401 [Holder Rule does not limit the attorney's fees a plaintiff may recover] with *Lafferty v. Wells Fargo Bank, N.A.* (2018) 25 Cal.App.5th 398, 418–419 (*Lafferty*) [Holder Rule's limitation on recovery applies to attorney's fees sought under Civil Code § 1780 of the Consumers Legal Remedies Act (CLRA)] and *Spikener v. Ally Financial, Inc.* (2020) 50 Cal.App.5th 151, 159–163 (*Spikener*) [Holder Rule's limitation on recovery applies to attorney's fees sought under the CLRA or Civil Code § 1459.5].)

We conclude that the Holder Rule does not limit the award of attorney's fees where, as here, a buyer seeks fees from a holder under a state prevailing party statute. The Holder Rule's limitation extends only to "recovery hereunder." This caps fees only where a debtor asserts a claim for fees against a seller and the claim is extended to lie against a holder by virtue of the Holder Rule. Where state law provides for recovery of fees from a holder, the Rule's history and purpose as well as the Federal Trade Commission's repeated commentary make clear that nothing in the Rule limits the application of that law.

## I.

In July 2016, Pulliam bought a "Certified Pre-Owned" 2015 Nissan Altima from HNL Automotive Inc. pursuant to a

retail sales contract that included the Holder Rule Notice (Notice). The dealership advertised the car as having cruise control and six-way power-adjustable seats. After buying the car, Pulliam learned that it did not meet the requirements of the Certified Pre-Owned program or have the advertised features she needed due to a disability.

In September 2016, Pulliam filed suit against the dealership and TDAF, which had accepted assignment of the contract. She alleged six causes of action based on the dealership's misconduct, including violation of the CLRA, breach of implied warranty under the Song-Beverly Act, fraud and deceit, negligent misrepresentation, violation of Business and Professions Code section 17200, and violation of Vehicle Code section 11711.

Following trial in April 2018, a jury found that the dealership failed to adequately package and label the car at issue and that the vehicle failed to conform to the promises of fact made on the label, in violation of the Song-Beverly Act. The jury awarded Pulliam $21,957.25 in damages. The court entered judgment in this amount jointly and severally against the dealership and TDAF.

Pulliam filed a posttrial motion seeking $169,602 in attorney's fees against both defendants under Civil Code section 1794, subdivision (d), which permits a buyer who prevails in an action under the Song-Beverly Act to recover attorney's fees. The dealership and TDAF raised several objections related to the amount of fees. TDAF also argued that it could not be liable for attorney's fees based on the Holder Rule's limitation on holder liability to amounts paid under the contract. The trial court rejected these arguments and granted Pulliam's motion.

The Court of Appeal affirmed the trial court's award, concluding that the Holder Rule does not limit liability for attorney's fees. (*Pulliam*, *supra*, 60 Cal.App.5th at p. 401.) We granted review.

## II.

The Federal Trade Commission (FTC) promulgated the Holder Rule in 1975 in response to rapid growth in consumer installment debt in the United States. (Promulgation of Trade Regulation Rule and Statement of Basis and Purpose, 40 Fed.Reg. 53506–53507 (Nov. 18, 1975); Guidelines on Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses, 41 Fed.Reg. 20022 (May 14, 1976).) Before the Holder Rule, a third party who purchased a consumer's promissory note did so "free and clear of any claim or grievance that the consumer may have with respect to the seller." (40 Fed.Reg. 53506.) This "holder in due course rule" meant a creditor could seek payment from a buyer on goods never delivered or not delivered as promised while remaining immune from the buyer's claims of fraud, misrepresentation, or breach of contract or warranty against the seller.

The FTC recognized that the application of the holder in due course rule to consumer credit sales was "anomalous" because consumers are not "in an equivalent position [to commercial entities] to vindicate their rights against a payee." (40 Fed.Reg., *supra*, at p. 53507.) "Between an innocent consumer, whose dealings with an unreliable seller are, at most, episodic, and a finance institution qualifying as 'a holder in due course,' the financer is in a better position both to protect itself and to assume the risk of a seller's reliability." (*Id.* at p. 53509.) The FTC recognized that "[c]reditors and sellers are in a position

to engage in meaningful, arms-length, bargaining," which differentiates them from buyers who sign adhesion contracts with sellers. (*Id.* at p. 53523.) Allocating the costs of seller misconduct to the creditor makes it much more likely that the "market will be policed" of "unscrupulous merchant[s]," that the market will reflect "a more accurate price for consumer goods," and that "all parties will benefit accordingly." (*Ibid.*)

To effect this allocation, the Holder Rule requires that the following Notice appear in consumer credit contracts "[i]n connection with any sale or lease of goods or services to consumers, in or affecting commerce": "Any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder." (16 C.F.R. § 433.2(a) (1975).) This provision gives consumers the ability to "defend a creditor suit for payment of an obligation by raising a valid claim against the seller as a set-off" and to "maintain an affirmative action against a creditor who has received payments for a return of monies paid on account." (40 Fed.Reg., *supra*, at p. 53524.)

In 2015, the FTC requested public comment on "the overall costs and benefits, and regulatory and economic impact" of the Holder Rule "as part of the agency's regular review of all its regulations and guides." (Rules and Regulations Under the Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses, 80 Fed.Reg. 75018 (Dec. 1, 2015).) In 2019, following completion of that review, the FTC "determined to retain the Rule in its present form." (Trade Regulation Rule Concerning Preservation of Consumers' Claims and Defenses, 84 Fed.Reg. 18711 (May 2, 2019) (Rule Confirmation).)

In its Rule Confirmation, the FTC noted that it had received six comments addressing "whether the Rule's limitation on recovery to 'amounts paid by the debtor' allows or should allow consumers to recover attorneys' fees above that cap." (84 Fed.Reg., *supra*, at p. 18713.) The FTC considered these comments and concluded that "if a federal or state law separately provides for recovery of attorneys' fees independent of claims or defenses arising from the seller's misconduct, nothing in the Rule limits such recovery. Conversely, if the holder's liability for fees is based on claims against the seller that are preserved by the Holder Rule Notice, the payment that the consumer may recover from the holder — including any recovery based on attorneys' fees — cannot exceed the amount the consumer paid under the contract." (*Ibid.*)

In January 2022, the FTC issued an advisory opinion to address the Holder Rule's "impact on consumers' ability to recover costs and attorneys' fees." (FTC, Commission Statement on the Holder Rule and Attorneys' Fees and Costs (Jan. 18, 2022) p. 1 (FTC Advisory Opinion).) The opinion observed that the issue "has arisen repeatedly in court cases, with some courts correctly concluding that the Holder Rule does not limit recovery of attorneys' fees and costs when state law authorizes awards against a holder, and others misinterpreting the Holder Rule as a limitation on the application of state cost-shifting laws to holders." (*Ibid.*, fn. omitted.)

## III.

Several recent Court of Appeal decisions have considered an award of attorney's fees in the context of a claim against a seller under the Holder Rule.

In *Lafferty*, the Laffertys sued the seller of a motor home and Wells Fargo, which had accepted assignment of their installment sales contract. (*Lafferty*, *supra*, 25 Cal.App.5th at p. 405.) The parties entered into a stipulated judgment awarding recovery to the Laffertys based on negligence and violation of the CLRA in the amount of $68,000, the "total amount Plaintiffs actually paid toward (or under) their installment contract for the purchase of [the] motorhome." (*Id.* at p. 407.) The Laffertys then moved for an award of attorney's fees and costs. Wells Fargo opposed the motion as exceeding the Holder Rule's cap on recovery. The trial court awarded the Laffertys costs but denied their request for fees. (*Id.* at pp. 407–408.) The Court of Appeal affirmed, holding that costs awarded to the Laffertys under Code of Civil Procedure section 1032, subdivision (b), "as the prevailing party in this action rather than as part of the recovery secured through the cause of action provided by the Holder Rule," were "not curtailed by the Holder Rule." (*Lafferty*, at p. 415.) Similarly, it concluded that the Laffertys were entitled to prejudgment interest because "Civil Code section 3287 applies to every person entitled to recover damages — without reference to the underlying cause(s) of action for which damages are awarded." (*Lafferty*, at p. 416.) But it held that attorney's fees sought under the fee-shifting provision of the CLRA were limited by the Holder Rule's cap because the cause of action under the CLRA was originally alleged against the seller and "applied to Wells Fargo only under the Holder Rule." (*Id.* at p. 419; *id.* at p. 414.)

In response to *Lafferty*, the Legislature enacted Civil Code section 1459.5, which provides: "A plaintiff who prevails on a cause of action against a defendant named pursuant to Part 433 of Title 16 of the Code of Federal Regulations or any successor

thereto, or pursuant to the contractual language required by that part or any successor thereto, may claim attorney's fees, costs, and expenses from that defendant to the fullest extent permissible if the plaintiff had prevailed on that cause of action against the seller." (All undesignated statutory references are to the Civil Code.) The bill aimed to "legislatively correct *Lafferty* by restoring the courts' previous interpretation of the Holder Rule, thereby ensuring fairness and legal recourse to defrauded consumers." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1821 (2019–2020 Reg. Sess.) as introduced Mar. 6, 2019, p. 1.)

In *Spikener*, the court considered whether a buyer who prevailed on a CLRA cause of action against a holder could subsequently recover attorney's fees based on section 1459.5. (*Spikener*, *supra*, 50 Cal.App.5th 151.) It assumed that the Holder Rule was ambiguous and determined that the FTC's interpretation in its Rule Confirmation was entitled to deference. (*Id.* at p. 159.) The court considered the FTC to have construed the Holder Rule as "limit[ing] a plaintiff's total recovery, including attorney fees, on a claim asserted pursuant to the Holder Rule to the amount the plaintiff paid under the contract, regardless of whether the state claim being asserted pursuant to the Holder Rule contains fee-shifting provisions." (*Id.* at p. 162.) The court found that "[t]his demonstrates a clear intent to prohibit states from authorizing a recovery that exceeds this amount on a Holder Rule claim" and concluded that "to the extent section 1459.5 authorizes a plaintiff's total recovery — including attorney fees — for a Holder Rule claim to exceed the amount the plaintiff paid under the contract, it directly conflicts with the Holder Rule and is therefore preempted." (*Id.* at pp. 162–163.)

In the case before us, the Court of Appeal disagreed with *Lafferty*'s conclusion that the Holder Rule's limitation on recovery applies to attorney's fees. (*Pulliam*, *supra*, 60 Cal.App.5th at pp. 412–416.) It also disagreed with *Spikener*'s conclusion that the FTC's Rule Confirmation was entitled to deference. (*Pulliam*, at pp. 416–422.) Because it concluded that "the Holder Rule cap does not include attorney fees within its limit on recovery and that the FTC's interpretation to the contrary is not entitled to deference," it found the Holder Rule consistent with section 1459.5 and did "not address whether section 1459.5 independently applies." (*Pulliam*, at p. 422.)

## IV.

The parties' dispute before us centers on two main arguments. First, TDAF argues that the Holder Rule, by capping "recovery" to "amounts paid by the debtor," limits a plaintiff's ability to recover attorney's fees based on the Rule's plain language. Pulliam maintains, as did the Court of Appeal, that "recovery" under the Rule does not include attorney's fees and relies on the regulatory history and purpose of the Rule. Second, TDAF argues that if the meaning of the Rule is ambiguous, the FTC's interpretation in its Rule Confirmation is entitled to deference and precludes recovery of attorney's fees. Pulliam contends that under *Kisor v. Wilkie* (2019) 588 U.S. __ [139 S.Ct. 2400] (*Kisor*), the FTC's interpretation does not warrant deference.

We must exhaust "all the standard tools of interpretation" to determine if a regulation is "genuinely ambiguous" before considering deference to an agency's own interpretation of its regulation. (*Kisor*, *supra*, 588 U.S. at p. __ [139 S.Ct. at p. 2414].) As explained below, we find that the most persuasive

reading of the Rule, in light of its history and purpose, is that its cap on "recovery hereunder" does not include attorney's fees for which a holder may be liable under state law, as long as the existence of such liability is not due to the Holder Rule extending the seller's liability for attorney's fees to the holder. And we need not decide whether the FTC's interpretation in the Rule Confirmation is entitled to deference because the FTC's statements on the topic are consistent with our interpretation.

## A.

We begin with the text of the Holder Rule. " ' "We interpret relevant terms in light of their ordinary meaning, while also taking account of any related provisions and the overall structure of the statutory scheme to determine what interpretation best advances the Legislature's underlying purpose." ' [Citation.] 'If we find the statutory language ambiguous or subject to more than one interpretation, we may look to extrinsic aids, including legislative history or purpose to inform our views.' " (*In re A.N.* (2020) 9 Cal.5th 343, 351–352.) We " 'must construe [remedial provisions] broadly, not . . . restrictively' " (*Kelly v. Methodist Hospital of So. California* (2000) 22 Cal.4th 1108, 1114), " 'so as to afford all the relief' that their 'language . . . indicates . . . the Legislature intended to grant' " (*Skidgel v. California Unemployment Ins. Appeals Bd.* (2021) 12 Cal.5th 1, 23). (See *Kisor, supra,* 588 U.S. at p. __ [139 S.Ct. at p. 2415] [courts interpreting agency regulations take the " 'traditional' " approach of " 'carefully consider[ing]' the [regulation's] text, structure, history, and purpose"].)

The Notice required by the Rule provides: "Any holder of this consumer credit contract is subject to all claims and

defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder." (16 C.F.R. § 433.2(a) (1975).) The question is under what circumstances, if any, "recovery hereunder by the debtor" includes attorney's fees sought by a debtor from a holder.

In ordinary parlance, the phrase "recovery hereunder by the debtor" might be interpreted to limit a consumer's recovery for compensatory or consequential damages, i.e., the amount the debtor ultimately receives. (See 40 Fed.Reg., *supra*, at p. 53526 ["While the wording of the notice is legalistic, we believe that it will be understood by most consumers."].) Attorney's fees would not be considered part of a consumer's recovery because any fees collected end up not with the consumer but with the consumer's attorney. This interpretation has particular salience in the consumer fraud context where contingency fees are commonplace. When plaintiffs represented under contingency arrangements recover attorney's fees based on fee-shifting provisions, they are not recouping an amount they have already paid to their attorneys; instead, they are being awarded fees that "belong to the attorneys who labored to earn them." (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 575.)

At the same time, "recovery hereunder by the debtor" could mean any money a debtor receives, even if the money does not come to rest with the debtor. TDAF contends that "[c]ommon usage by courts and in statutes confirms that 'recovery' means all 'recoverable litigation costs,' and that 'recoverable litigation costs do include attorney fees.' " (Quoting *Santisas v. Goodin* (1998) 17 Cal.4th 599, 606.) The Court of Appeal in *Lafferty* similarly relied on the fact that "[c]ourts have

11

used the term 'recovery' to include attorney fees and interest awarded as part of a judgment." (*Lafferty*, *supra*, 25 Cal.App.5th at p. 412.) But we do not find instructive the use of the term "recovery" by courts in contexts where the meaning of the term was not at issue.

TDAF also relies on the current version of Black's Law Dictionary in arguing that the Notice's language is unambiguous in limiting recovery of attorney's fees to amounts paid under the contract. Black's Law Dictionary defines "recovery" as: "1. The regaining or restoration of something lost or taken away. . . . 2. The obtainment of a right to something (esp. damages) by a judgment or decree. . . . 4. An amount awarded in or collected from a judgment or decree." (Black's Law Dict. (11th ed. 2019) p. 1528.) Westlake Services, LLC (Westlake), appearing as amicus curiae, argues that the version of Black's Law Dictionary contemporaneous to promulgation of the Rule should be used. At that time, recovery was defined as: "In its most extensive sense, the restoration or vindication of a right existing in a person, by the formal judgment or decree of a competent court, at his instance and suit, or the obtaining, by such judgment, of some right or property which has been taken or withheld from him." (Black's Law Dict. (4th rev. ed. 1968) p. 1440.)

Neither of these definitions conclusively answers our inquiry. Attorney's fees are more naturally characterized as something earned or awarded after a party prevails in an action than as a right or property "which has been taken or withheld." (Black's Law Dict. (4th rev. ed. 1968) p. 1440.) Moreover, the meaning of "recovery" in the context of the Holder Rule must be considered in light of the words that surround it. The question is whether the Holder Rule's limitation on "recovery hereunder

by the debtor" applies to the circumstances here. (16 C.F.R. § 433.2(a) (1975).) The fact that attorney's fees may be a type of "recovery" in some contexts because they are "collected" or "obtain[ed]" by a judgment (see Black's Law Dict. (11th ed. 2019) p. 1528) does not necessarily mean that such fees constitute "recovery . . . *by the debtor*" or "recovery *hereunder*" within the meaning of the Holder Rule (16 C.F.R. § 433.2(a) (1975), italics added). The Rule subjects a creditor "to all claims and defenses which the debtor could assert *against the seller*" and limits "recovery *hereunder* by the debtor" to "amounts paid by the debtor" on the contract. (*Ibid.*, italics added.) Even if "recovery" included attorney's fees, the language of the Rule does not reveal whether its cap applies to fees sought directly against a holder under a state law.

Finally, TDAF argues that the meaning of the Rule is unambiguous because the Rule "limits a consumer's 'recovery,' . . . not by kind, but by amount." In TDAF's view, limiting "recovery" to "amounts paid by the debtor hereunder" confirms the "broad sweep" of the word "recovery." But the limitation on recovery to amounts paid by the debtor under the contract is readily understood to support the opposite conclusion — namely, that the FTC had damages rather than attorney's fees in mind. After all, the quantity of attorney's fees sought after judgment bears little relationship to the amount of the cap, while the "amounts paid by the debtor" under the contract may often be exactly the quantity sought in damages. (See, e.g., 40 Fed.Reg., *supra*, at p. 53527 ["In a case of nondelivery, total failure of performance, or the like, we believe that the consumer is entitled to a refund of monies paid on account."].)

## B.

Because the language of the Rule is ambiguous with regard to the issue before us, we turn to extrinsic sources. (See, e.g., *Gardebring v. Jenkins* (1988) 485 U.S. 415, 428, fn. 14 [examining regulation's adoption history].) We look first to materials shedding light on the Rule's history and purpose before considering the agency's own interpretation of the Rule in its 2019 and 2022 statements. (*Kisor, supra,* 588 U.S. at p. __ [139 S.Ct. at p. 2415].)

In examining the history of the Holder Rule, we observe that attorney's fees are absent from the FTC's discussions of what constitutes recovery under the Rule until its 2019 Rule Confirmation. The regulatory materials issued prior to the Rule Confirmation do not refer to attorney's fees. Instead, they suggest that the FTC had damages in mind when it referred to "recovery" in the Holder Rule Notice. In its Statement of Basis and Purpose, the FTC referred to the recovery of consumers' damages when discussing why affirmative suits by consumers against sellers were an inadequate remedy for seller misconduct. (40 Fed.Reg., *supra,* at pp. 53511–53512 ["The amount of a consumer's damages in such a case may be substantial in real terms, . . . but such damages are rarely enough to attract competent representation."].) And in surveying the record, the FTC was troubled by the "magnitude or extent of consumer injury from forfeited claims and defenses in credit sale transactions." (*Id.* at p. 53510.) When discussing the affirmative actions against creditors that would be available under the Holder Rule, the FTC referred repeatedly to a return of monies paid on account. (See *id.* at p. 53524 ["[A] consumer can . . . maintain an affirmative action against a creditor who has received payments for a return of monies paid on account."];

*id.* at p. 53527 ["In a case of nondelivery, total failure of performance, or the like, we believe that the consumer is entitled to a refund of monies paid on account."].)

Guidance issued by the FTC on the day the Rule went into effect suggests that "consequential damages and the like" are considered "recovery" under the Holder Rule and available up to the "amount[] paid by the debtor" under the contract. (41 Fed.Reg., *supra*, at p. 20023.) While the guidance notes that it has "not been formally reviewed or adopted by the Commission" (*id.* at p. 20022), the FTC later highlighted its statements without disagreement in its 2019 Rule Confirmation. (84 Fed.Reg., *supra*, at p. 18713, fn. 30; see *Kisor, supra*, 588 U.S. at p. __ [139 S.Ct. at p. 2416] [published staff guidance can be an appropriate source of insight], citing *Ford Motor Credit Co. v. Milhollin* (1980) 444 U.S. 555, 566, fn. 9, 567, fn. 10.) The guidance said: "[T]he consumer may assert, by way of claim or defense, a right not to pay all or part of the outstanding balance owed the creditor under the contract; but the consumer will not be entitled to receive from the creditor an affirmative recovery which exceeds the amounts of money the consumer has paid in. [¶] *Thus, if a seller's conduct gives rise to damages in an amount exceeding the amounts paid under the contract*, the consumer may (1) sue to liquidate the unpaid balance owed to the creditor and to recover the amounts paid under the contract and/or (2) defend in a creditor action to collect the unpaid balance. *The consumer may not assert* [*against*] *the creditor any rights he might have against the seller for additional consequential damages and the like.*" (41 Fed.Reg., *supra*, at p. 20023, italics added.) "[C]onsequential damages and the like" that exceed the amounts of money the consumer has paid in would not be recoverable based solely on the Holder Rule. (*Ibid.*)

During congressional testimony shortly after the Rule's passage, the acting director of the FTC's Bureau of Consumer Protection similarly described the "one express cautionary limitation on a creditor's exposure[:] The consumer may never recover consequential damages under the provision which exceed the amount of the credit contract." (Consumer Claims and Defenses, Hearings before House Com. on Interstate and Foreign Commerce, Subcom. on Consumer Protection and Finance, 94th Cong., 2d Sess., at p. 23 (1976).) "The consumer, in all cases, is limited to the exact amount of legal damages. Only when a consumer's legal damages exceed the amounts he still owes a creditor under the contract will the consumer be in a position to seek a return of all or part of the monies he has already paid." (*Ibid.*)

Amici curiae in support of TDAF argue that the FTC's repeated references to damages in its Statement of Basis and Purpose demonstrate that "if the FTC had intended to limit only damage awards it would have rewritten the Rule's second sentence thus: 'Recovery *of damages* hereunder by the debtor shall not exceed amounts paid by the debtor hereunder.'" (Italics added.) Amici curiae argue that the FTC "deliberately began the Holder Rule's second sentence with a different word having a broader meaning." But they cite nothing in the regulatory history of the Rule that would lead us to so conclude; there is no discussion of recovery of costs, attorney's fees, or anything but damages. Had the FTC intended its Rule to sweep so broadly, we would expect to see some discussion of other types of awards, not just damages.

In sum, the FTC had damages in mind when limiting recovery under the Rule, and there is no indication that attorney's fees were intended to be included within its scope.

The FTC was aware of the diversity among states when it came to consumer protection and other laws. (See, e.g., 40 Fed.Reg., *supra*, at pp. 53510, 53512, 53520–53521.) In California, "attorney's fees *qua* attorney's fees" — that is, the fees "attributable to the bringing of the . . . action itself" — are not an element of damages. (*Brandt v. Superior Court* (1985) 37 Cal.3d 813, 818, 817.) Instead, they are defined as "costs." (Code Civ. Proc., § 1033.5, subd. (a)(10).) And, except as otherwise expressly provided by statute, a prevailing party in California "is entitled as a matter of right to recover costs in any action or proceeding." (*Id.*, § 1032, subd. (b).) California's costs statute further specifies attorney's fees are allowable as costs when authorized by contract, statute, or law. (*Id.*, § 1033.5, subd. (a)(10).) The Song-Beverly Act is one such statute. Under Civil Code section 1794, subdivision (b), buyers of consumer goods may seek "damages . . . includ[ing] the rights of replacement or reimbursement." Subdivision (d) separately provides that buyers may, "as part of the judgment," recover "costs and expenses, including attorney's fees." The regulatory history provides no reason to think the FTC intended to alter this state-specific statutory framework.

## C.

The Holder Rule's regulatory history also demonstrates the FTC's expectation that buyers would be able to assert defenses against creditor claims based on the Holder Rule as well as pursue affirmative litigation against creditors for seller misconduct, which would be financially infeasible for many buyers if attorney's fees were not recoverable.

The Holder Rule was designed to abrogate "[t]he insulation obtained by creditors in consumer transactions" and

to address "the loss of legitimate consumer claims" by the application of the holder in due course doctrine. (40 Fed.Reg., *supra*, at pp. 53509–53510.) The FTC's "primary concern" in promulgating the Rule was "the distribution or allocation of costs occasioned by seller misconduct in credit sale transactions." (*Id.* at p. 53522.) Rather than allocate these costs to the consumer, as the holder in due course rule had done, the new rule recognized that "the creditor is always in a better position than the buyer to return seller misconduct costs to sellers, the guilty party," and was designed to "compel[] creditors to either absorb seller misconduct costs or return them to sellers." (*Id.* at p. 53523.)

The FTC recognized that "the problems associated with the holder in due course doctrine are most keenly felt by the poor in our society . . . ." (40 Fed.Reg., *supra*, at p. 53510.) It considered the challenges, including high legal costs, for consumers associated with bringing suits against sellers as an impetus to adopting the new rule: "[A]ggrieved consumers are often not in a position to take advantage of the legal system. Where seller misconduct in a credit sale transaction has given rise to consumer injury, the consumer is theoretically in a position to seek damages or other relief from the seller in court. . . . *The amount of a consumer's damages in such a case may be substantial in real terms . . . but such damages are rarely enough to attract competent representation. The sheer costs of recourse to the legal system to vindicate a small claim, together with the days of work that must be missed in order to prosecute such a claim to judgment, render recourse to the legal system uneconomic.* In addition, the worst sellers are likely to be the most volatile entities where market tenure is concerned. They prove difficult to locate and serve, and the marginal liquidity

18

which characterizes their operations makes collection of a judgment difficult or impossible even if they are successfully served. Bankruptcy or insolvency becomes a final barrier to recovery." (*Id.* at pp. 53511–53512, italics added; see also *id.* at p. 53521 ["Judicial relief requires more time and money than most consumers can afford . . . ."].)

The FTC recognized similar costs associated with defending against a creditor's suit for payment under the old rule: When responding to a creditor's assertion of " 'holder in due course status,' " a consumer's "success depends on obtaining skilled counsel; and heavy expenses must be incurred to obtain the discovery and documentation needed to show concerted efforts on the part of the seller and creditor." (40 Fed.Reg., *supra*, at p. 53512.) The FTC highlighted a comment by a private attorney describing the experience of one Northern Virginia family that was "unable to provide themselves with counsel" in defending against a claim by a creditor because of the legal costs "necessary to establish a link between the lender, the financier and the seller of the goods. Most attorneys, especially in a case of this kind where 'new ground is being plowed[,]' require a sizeable deposit for costs . . . . Additionally, [] the total attorney's fee in a matter such as this may be well over $500.00. When faced with this set of realistic facts most clients who get into such a situation in the first place are unable to provide themselves with protection in the form of adequate counsel." (*Ibid.*)

Based in part on these challenges, the FTC determined that a creditor "is always in a better position than the buyer to return seller misconduct costs to sellers . . . because (1) he engages in many transactions where consumers deal infrequently; (2) he has access to a variety of information

systems which are unavailable to consumers; (3) he has recourse to contractual devices which render the routine return of seller misconduct costs to sellers relatively cheap and automatic; and (4) *the creditor possesses the means to initiate a lawsuit and prosecute it to judgment where recourse to the legal system is necessary*." (40 Fed.Reg., *supra*, at p. 53523, italics added.)

The Holder Rule reallocates seller misconduct costs by placing the creditor "in the shoes of the seller," subjecting the creditor "to all *claims and defenses* which the debtor could assert against the seller." (41 Fed.Reg., *supra*, at p. 20023, italics added, capitalization omitted.) Thus, the FTC provided two ways for buyers to effect this reallocation: by "defend[ing] a creditor suit for payment of an obligation by raising a valid claim against the seller as a set-off" or by "maintain[ing] an affirmative action against a creditor who has received payments for a return of monies paid on account." (40 Fed.Reg., *supra*, at p. 53524.) The FTC expressly rejected requests to limit the rule to provide a consumer the ability to assert his rights "only as a matter of defense or setoff against a claim by the assignee or holder." (*Id.* at p. 53526.) It envisioned affirmative suits against creditors over seller misconduct as one of the ways that creditors would be forced to internalize the costs of seller misconduct and would thus be incentivized to police the market for "unscrupulous merchant[s]." (*Id.* at p. 53523.) It anticipated that "[a]s legal services offices, consumer groups, and individual consumers test the rule by periodic lawsuits against creditors and sellers, . . . the rule will enjoy increasing knowledge and use on the part of all consumers." (*Id.* at p. 53526.)

The Holder Rule therefore took shape with the FTC contemplating affirmative suits while expressly recognizing that the cost of suit in a case involving consumer damages may

"render recourse to the legal system uneconomic." (40 Fed.Reg., *supra*, at p. 53512.) It nonetheless expected affirmative claims against sellers and creditors — not just defenses to debt collection — to help allocate risks and rationalize the market. Given these expectations, it seems unlikely that the FTC intended without comment or explanation to include attorney's fees in its limitation on creditor liability under the Rule. A consumer's ability to obtain attorney's fees often proves critical for consumers to access the judicial system. It is true that by obviating the need for lengthy legal proceedings over a creditor's status, the Rule might decrease the legal costs consumers must incur. But it is unlikely that this would materially alter many consumers' ability to vindicate their rights given the high costs that remain "to vindicate a small claim." (40 Fed.Reg., *supra*, at p. 53512; see, e.g., Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1821 (2019–2020 Reg. Sess.) as introduced Mar. 6, 2019, p. 6 ["The vast majority of customers who pay for items such as cars and furniture in monthly installments can't afford to hire attorneys."].) Were attorney's fees part of the Holder Rule's limit on recovery, the effective result for many, if not most, consumers would be the same as their options were under the holder in due course rule that the FTC sought to supplant.

TDAF argues that if attorney's fees were "so central to the Holder Rule's success," the Rule's text or guidance would have "expressly remove[d] attorney's fees from the Rule's use of the otherwise broad term 'recovery.'" But the history of the Rule leaves us no reason to believe that the FTC thought it was addressing attorney's fees at all by reference to "recovery." To the contrary, given the FTC's discussion of the legal costs facing consumers, one would expect the FTC to have expressly stated

a limitation on collection of attorney's fees if that is what it had intended the Rule to encompass.

TDAF also argues that recovery of uncapped attorney's fees would be contrary to the Rule's express constraint on liability and its consumer protection purposes because it could jeopardize the availability of consumer financing. The FTC was aware of creditors' concerns at the time of promulgating the rule. (40 Fed.Reg., *supra*, at pp. 53517–53518.) Nonetheless, it rejected proposals to include an absolute upper limit on the amount a consumer could recover, considering such a cap unnecessary to protect the market for consumer debt. (*Id.* at p. 53527.) While the FTC considered creditors' concerns about exposure, it ultimately chose to provide consumers with recovery up to amounts paid on the contract, irrespective of the size of the contract, to better reallocate the costs of seller misconduct. (*Ibid.*) The FTC was not as single-mindedly concerned with creditors' bottom lines as TDAF suggests.

## D.

In any event, the history of the Holder Rule indicates that the FTC intended the Rule to serve as a national floor, not to restrict the application of state laws authorizing additional awards of damages or attorney's fees against a seller or holder. (See FTC, FTC Finds Broad Compliance Among Auto Dealers with Rule That Protects Consumers with Car Loans (May 16, 2011) ["Without the Rule, consumers would not have this protection in states that preclude them from asserting against lenders the claims and defenses they have against dealers if the

lenders bought the credit contracts in good faith and without knowledge of these claims and defenses."].)

In promulgating the Rule, the FTC detailed the patchwork of state laws in existence and anticipated further state action. (40 Fed.Reg., *supra*, at p. 53521.) Around the time the FTC was considering the Holder Rule, Congress created the National Commission on Consumer Finance (NCCF) "to study and make recommendations on the need for further regulation of the consumer finance industry." (Pub.L. No. 90-321 (May 29, 1968) 82 Stat. 146.) In the FTC's initial proceedings, it declined to "withhold action until the report of the [NCCF] was completed and published." (40 Fed.Reg., *supra*, at p. 53521.) In promulgating the Rule, the FTC again declined to wait until "the individual states [] have an opportunity to enact the NCCF recommendations." (*Ibid.*) Importantly, the NCCF not only "recommended abolition of the holder in due course doctrine," as the FTC sought to accomplish with the Holder Rule, but also "urged restrictions on remedies such as garnishment, repossession, and wage assignment," and "recommended abolition of . . . confessions of judgment[] and harassing tactics in debt collections." (NCCF, Consumer Credit in the United States (Dec. 31, 1972) p. iii.) The FTC clearly anticipated that states implementing NCCF recommendations could and would take actions more protective than the Holder Rule.

In promulgating the Rule, the FTC also addressed the argument that "state action has made Commission action unnecessary." (40 Fed.Reg., *supra*, at p. 53521.) To this, the FTC responded that "only a few [states] have enacted a comprehensive measure" and that "partial limitations [in some other states] do not reach the full extent of the problem." (*Ibid.*) The FTC noted that "[m]any witnesses agree that a trade

regulation rule would encourage rather than discourage further state action." (*Id.* at p. 53522, fn. 65.) It concluded that "th[e] Rule will serve as a model for further state legislation and give states which lack legislation impetus to act." (*Id.* at p. 53521.)

The staff guidance reaffirms that the FTC contemplated that state law might offer greater protections for consumers. It describes how under the Notice, "[t]he creditor stands in the shoes of the seller" subject to "an important limitation on the creditor's liability." (41 Fed.Reg., *supra*, at p. 20023.) The last sentence of the Notice — that "recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder" — "limits the consumer to a refund of monies paid under the contract, in the event that an affirmative money recovery is sought." (*Ibid.*, capitalization omitted.) But, it explained, "[t]he limitation on affirmative recovery *does not eliminate any other rights the consumer may have as a matter of local, state, or federal statute.* The words 'recovery hereunder' which appear in the text of the Notice refer specifically to a recovery under the Notice. *If a larger affirmative recovery is available against a creditor as a matter of state law, the consumer would retain this right.*" (*Ibid.*, italics added.) The FTC highlighted these statements without disagreement in its 2019 Rule Confirmation. (84 Fed.Reg., *supra*, at p. 18713, fn. 30.) Where the FTC has disagreed with the guidance, it has expressly said so. (See FTC, FTC Staff Issues Note on Holder Rule and Large Transactions (Apr. 14, 2021) ["The new staff note corrects an erroneous statement in [the] 1976 pamphlet by FTC staff that the Holder Rule did not apply to transactions larger than $25,000."].)

This understanding of the Holder Rule also flows naturally from the text of the Notice which provides that

"recovery *hereunder* by the debtor shall not exceed amounts paid by the debtor hereunder." (16 C.F.R. § 433.2(a) (1975), italics added.) The Holder Rule extended claims and defenses by a consumer against a seller based on state law or common law so that such claims and defenses would lie against third party creditors. The words "recovery hereunder" limit this extension to "amounts paid by the debtor" under the contract. (*Ibid.*) But this limitation says nothing about the ability of states to provide consumers greater recovery against creditors than that available solely under the Holder Rule or to provide for the award of fees from creditors following suit.

TDAF argues that the Rule "does not allow uncapped attorney's fees because doing so would run contrary to the Rule's goal of efficiently allocating the risks of seller misconduct without making creditors the guarantors of sellers' performance." Westlake similarly maintains that creditor liability for attorney's fees would be in excess of that intended by the Rule. To be sure, the FTC chose to limit creditor liability under the Holder Rule to amounts paid by the debtor under the contract rather than pass on all seller misconduct costs to creditors. (See 41 Fed.Reg., *supra*, at p. 20023.) But, as noted, the FTC anticipated further state action and only limited "recovery *hereunder*" to amounts paid by the debtor. (*Ibid.*, italics added, capitalization omitted.) Accordingly, the fact that consumers may be able to claim attorney's fees in suits against creditors based on state law is not at odds with the Holder Rule's purpose.

Neither the language of the Holder Rule nor its history suggest that it was intended to displace or prevent state law from authorizing greater recovery than what a plaintiff may recover based on the language of the Notice alone. In

repudiating the holder in due course doctrine and expanding creditor liability up to a point, the FTC made clear it was setting a national floor, not a ceiling that states may not exceed. It cited several states' preexisting consumer protection statutes — including California's Unruh Act (§ 1801 et seq.) — as examples informing its decision to act in the first place. (40 Fed.Reg., *supra*, at p. 53527.) It is difficult to imagine the FTC citing such laws favorably if it intended, without comment, to simultaneously squelch any of their fee-shifting provisions and hamper state initiative in the consumer protection context. TDAF takes issue with the Court of Appeal's ruling in this case because, in its view, the award of attorney's fees "creates an opportunistic litigation landscape for consumers' attorneys" and "ultimately harms consumers by discouraging financing of consumer loans." But given the FTC's preservation of consumers' rights under state law, TDAF's contentions amount to a policy argument against fee-shifting provisions like those in the Unruh Act, section 1459.5, or section 1794, subdivision (d). Those contentions should be directed at the Legislature or the FTC.

In sum, the FTC was cognizant of the challenges facing consumers bringing suit, including high legal costs, and it intended and expected affirmative suits by consumers to help correct the market failures it identified. In light of this history, it would be antithetical to the purpose of the Holder Rule to conclude that the FTC intended to "render . . . uneconomic" one of the two ways it provided to address the concerns it sought to alleviate by implicitly limiting a consumer's ability to obtain attorney's fees. (40 Fed.Reg., *supra*, at p. 53512.) The FTC was focused on consumers' recovery of damages and intended the Rule to provide a minimum, not maximum, liability rule for the

nation. In light of the FTC's contemporaneous explanation of the Rule's purposes, we find it unlikely that the FTC intended the Rule's limitation on recovery to apply to attorney's fees sought by a consumer from a holder under state law.

### E.

TDAF argues that to the extent the Holder Rule's language is ambiguous, we should defer to the FTC's interpretation. But whether or not deference is warranted, the result is the same in this case because, as we now explain, the FTC's interpretation in its 2019 Rule Confirmation, insofar as it relates to what qualifies as "recovery hereunder," accords with our own.

The FTC wrote that "if a federal or state law separately provides for recovery of attorneys' fees independent of claims or defenses arising from the seller's misconduct, nothing in the Rule limits such recovery. Conversely, if the holder's liability for fees is based on claims against the seller that are preserved by the Holder Rule Notice, the payment that the consumer may recover from the holder — including any recovery based on attorneys' fees — cannot exceed the amount the consumer paid under the contract." (84 Fed.Reg., *supra*, at p. 18713.)

We understand these statements to mean that if there is no federal or state law authorizing fees against the holder, a buyer cannot use the Holder Rule to secure from the holder a claim for fees against the seller in excess of amounts paid on the contract. It is significant that the FTC uses the phrase "if the holder's liability for fees is based on claims *against the seller* that are preserved by the Holder Rule Notice." (84 Fed.Reg., *supra*, at p. 18713, italics added.) The sentence that immediately follows likewise provides: "Claims *against the seller* for

attorneys' fees or other recovery may also provide a basis for set off against the holder that reduces or eliminates the consumer's obligation." (*Ibid.*, italics added.) In other words, the FTC's interpretation is that the Holder Rule's cap on recovery applies to attorney's fees where a plaintiff's claim to attorney's fees lies against *a seller* and, by virtue of the Holder Rule, is extended to lie against third party creditors. It does not apply where the claim for fees lies against the third party creditor in the first instance. If state law authorizes fees against a holder, the FTC agrees that the Holder Rule places no limitation on their recovery. In such circumstances, it is of no moment that the buyer's substantive claims against the holder may be related to the seller's misconduct.

TDAF interprets the Song-Beverly Act's fee-shifting provision to allow a prevailing party buyer to recover attorney's fees from the holder "based on claims against the seller that are preserved by the Holder Rule Notice" (84 Fed.Reg., *supra*, at p. 18713) because TDAF was only brought into the suit based on Pulliam's claims against the dealership that were extended to lie against TDAF under the Holder Rule. But Pulliam's claim *for attorney's fees* against TDAF is based on section 1794, subdivision (d), which permits any buyer who "prevails in an action under this section" to "recover . . . attorney's fees"; it is not "based on claims *against the seller*" for attorney's fees (84 Fed.Reg., *supra*, at p. 18713, italics added). TDAF also contends that section 1794, subdivision (d) is not "independent of claims or defenses arising from the seller's misconduct" (84 Fed.Reg., *supra*, at p. 18713) because TDAF's liability to suit in this case is based on the Holder Rule. But this interpretation similarly confuses a buyer's claim for statutory attorney's fees as a prevailing party in the litigation against a creditor with a

buyer's claim against a seller that is extended to the creditor only by virtue of the Holder Rule.

The parties do not dispute that Pulliam could pursue an action under the Song-Beverly Act against TDAF because of the Holder Rule. (See § 1794, subd. (a) ["Any buyer of consumer goods who is damaged by a failure to comply with any obligation under this chapter or under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief."].) After Pulliam prevailed, the trial court entered judgment in Pulliam's favor jointly and severally against TDAF and the dealership. Pulliam then moved for attorney's fees against TDAF under section 1794, subdivision (d). (See *Folsom v. Butte County Assn. of Governments* (1982) 32 Cal.3d 671, 677 [costs, including attorney's fees, " 'constitute no part of a judgment at the moment of its rendition' "].) Section 1794 contains no language limiting fee awards to sellers as opposed to any other parties against whom a buyer has prevailed. (See *Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 990 [Song-Beverly " 'is manifestly a remedial measure, intended for the protection of the consumer; it should be given a construction calculated to bring its benefits into action' "].) It provides for fees against any losing defendant who chose to oppose a consumer's claim. Thus, section 1794, subdivision (d) provided the basis for Pulliam's claim for fees against TDAF and was unaffected by the Holder Rule's limitation on "recovery hereunder" for claims asserted by a buyer against a seller and extended to lie against a holder.

This understanding of the Rule and the Rule Confirmation is in agreement with a recent Advisory Opinion issued by the FTC, which states that "the Holder Rule does not limit recovery of attorneys' fees and costs when state law authorizes awards

against a holder." (FTC Advisory Opn., *supra*, at p. 1.) The opinion further explains that "whether costs and attorneys' fees may be awarded against the holder . . . is determined by the relevant law governing costs and fees," and "[n]othing in the Holder Rule states that application of [prevailing party statutes] to holders is inconsistent with Section 5 of the FTC Act or that holders should be wholly or partially exempt from these laws." (*Id.* at p. 2.) "Further, if the applicable law requires or allows costs or attorneys' fee awards against a holder, the Holder Rule does not impose a cap on such an award. The sentence in the Holder Rule Notice that limits recovery to 'amounts paid by the debtor' applies only to monetary recovery against holders based on the Holder Rule Notice . . . ; the Rule places no cap on a consumer's right to recover from the holder for other reasons." (*Id.* at p. 3.) The FTC expressly disavowed reading the Rule Confirmation "as mandating a different result." (*Ibid.*) "Neither the Rule itself nor the 2019 Rule Confirmation notice say that the Holder Rule invalidates state law or that there is a federal interest in limiting state remedies. To the contrary, the 2019 Rule Confirmation says that nothing in the Holder Rule limits recovery of attorneys' fees if a federal or state law separately provides for recovery of attorneys' fees independent of claims or defenses arising from the seller's misconduct." (*Id.* at pp. 3–4.)

The FTC gave the example of a consumer authorized to recover fees from parties that unsuccessfully oppose the consumer's claims. "In this scenario," which is squarely on point, "the . . . fee award is separate and supported by a law that is independent of the Holder Rule. Thus, the Holder Rule Notice does not limit . . . attorneys' fees that the applicable law directs or permits a court to award against a holder because of its role in litigation." (FTC Advisory Opn., *supra*, at p. 3.) It is only

where a "consumer is awarded fees in a suit solely against the seller, or the law allows awards only against a seller that has engaged in specified conduct," that "the seller's liability for . . . fees may be raised against the holder because of the Holder Rule Notice"; in that case, the Holder Rule "authorizes the consumer to recover such an award from the holder up to the amount paid." (*Ibid.*)

TDAF argues that the FTC Advisory Opinion "lacks any persuasive effect," citing *Christensen v. Harris County* (2000) 529 U.S. 576, 587. But the FTC's interpretation of the Rule and the Rule Confirmation is consistent with the Rule's text, history, and purpose, including the FTC's repeated statements that it did not intend to interfere with state laws authorizing additional awards. (See 40 Fed.Reg., *supra*, at p. 53521; 41 Fed.Reg., *supra*, at p. 20023; 84 Fed.Reg., *supra*, at p. 18713.)

It is clear that the FTC contemplated that state law might offer greater protections for consumers and that these protections might be accompanied by recovery in excess of the amounts paid on the contract. We have found no reason to interpret the Rule's limitation on "recovery hereunder" to extend more broadly than its plain language suggests or more broadly than the FTC intended. Where state law provides for attorney's fees against a holder, nothing in the Rule prevents their award to the full extent provided by state law. We disapprove of *Lafferty v. Wells Fargo Bank, N.A.*, *supra*, 25 Cal.App.5th 398 and *Spikener v. Ally Financial, Inc.*, *supra*, 50 Cal.App.5th 151 to the extent they are inconsistent with this opinion.

## CONCLUSION

We affirm the judgment of the Court of Appeal.

**LIU, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**ROBIE, J.**[*]

---

[*]     Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Pulliam v. HNL Automotive Inc.

---

<u>Procedural Posture</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 60 Cal.App.5th 396
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S267576
**Date Filed:** May 26, 2022

---

**Court:** Superior
**County:** Los Angeles
**Judge:** Barbara Marie Scheper

---

**Counsel:**

McCreary, Duncan J. McCreary; McGuireWoods, Leslie M. Werlin, Tanya L. Greene, Jamie D. Wells and Anthony Q. Le for Defendants and Appellants.

Madison Law, Jenos Firouznam-Heidari, James S. Sifers and Brett K. Wiseman for Westlake Services, LLC, as Amicus Curiae on behalf of Defendant and Appellant TD Auto Finance LLC.

Severson & Werson and Jan T. Chilton for American Bankers Association, American Financial Services Association, California Financial Services Association and Consumer Bankers Association as Amici Curiae on behalf of Defendant and Appellant TD Auto Finance LLC.

U.S. Chamber Litigation Center, Janet Galeria; Akin Gump Strauss Hauer & Feld, Aileen McGrath and Sina Safvati for Chamber of Commerce of the United States of America as Amicus Curiae on behalf of Defendant and Appellant TD Auto Finance LLC.

Rosner, Barry & Babbit, Hallen D. Rosner, Arlyn L. Escalante, Serena D. Aisenman and Michael A. Klitzke for Plaintiff and Respondent.

Eliza J. Duggan and Seth E. Mermin for UC Berkeley Center for Consumer Law and Economic Justice, Centers for Public Interest Law at the University of San Diego, Consumers for Auto Reliability and Safety, Consumer Federation of California, East Bay Community Law Center, Housing and Economic Rights Advocates, National Consumer Law Center and Public Law Center as Amici Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Tanya L. Greene
McGuireWoods LLP
355 South Grand Avenue, Suite 4200
Los Angeles, CA 90071
(213) 457-9879

Arlyn L. Escalante
Rosner, Barry & Babbitt, LLP
10085 Carroll Canyon Road, Suite 100
San Diego, CA 92131
(858) 348-0916