Filed 5/28/24  P. v. Yzararraz CA4/1
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANCISCO ANTHONY YZARARRAZ,<br><br>    Defendant and Appellant. | D080924<br><br><br>(Super. Ct. No. RIF2000713) |

APPEAL from a judgment of the Superior Court of Riverside County, Matthew C. Perantoni, Judge.  Reversed in part and remanded for resentencing.

Joanna Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric Swenson, Natasha Cortina and Christopher P. Beesley, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

After milling around for some time at a gas station, Francisco Anthony Yzararraz walked up to a man who had just pulled up to a gas pump. They had only spoken for a few seconds when Yzararraz—without any apparent provocation—pulled out a loaded gun, aimed it directly at the man's chest, and, without hesitation, shot him once at close range. Yzararraz immediately fled to an awaiting car with his two companions. The man died of a through and through gunshot wound to the chest, the bullet perforating his heart. His murder was captured on video by a surveillance camera.

After viewing the video evidence, in addition to hearing testimony from witnesses at the gas station, a jury convicted Yzararraz of first degree premeditated murder (Pen. Code,[1] § 187, subd. (a)) and found true a firearm enhancement (§ 12022.53, subd. (d)). After Yzararraz admitted a prior strike conviction, the trial court sentenced him to a prison term of five years followed by an indeterminate sentence of 75 years to life.

Yzararraz appeals, asserting there was insufficient evidence to support the jury's finding that his murder of the man was deliberate and premeditated. We have reviewed the video evidence and, on this record, we conclude there was substantial evidence to support the jury's finding that Yzararraz's decision to kill, even if arrived at quickly, was the result of the requisite reflection to support a conviction of murder in the first degree.

Yzararraz also raises two contentions of sentencing error. We reject his first claim that his sentence of 80 years to life is unconstitutional. His second claim is that his case should be remanded for resentencing because the trial court was unaware of its discretion under *People v. Tirado* (2022) 12 Cal.5th

---

[1] All further statutory references are to the Penal Code.

688 (*Tirado*)—which was decided after his sentencing—to impose a lesser sentence for the firearm enhancement. In our prior opinion, we rejected this claim too, concluding the record clearly indicates the trial court, in rejecting all possible options for reducing his sentence, including through a *Romero*[2] motion, would not have imposed a lesser sentence even had *Tirado* been decided by the time of his sentencing.

The California Supreme Court granted Yzararraz's petition for review and transferred it to this court, with directions to vacate our prior decision and reconsider the cause in light of *People v. Salazar* (2023) 15 Cal.5th 416 (*Salazar*). (*People v. Yzararraz*, S280178, Supreme Ct. Mins., Mar. 12, 2024.) In compliance with *Salazar*, we hereby vacate our prior opinion and remand the matter for resentencing. We affirm the judgment in all other respects.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *Evidence*[3]

At trial, the People presented testimony from, among others, a gas station attendant, a customer at the gas station, law enforcement witnesses, a criminalist, and the forensic pathologist who performed the victim's autopsy. The jury was also shown video footage from two surveillance cameras installed at the gas station. Yzararraz did not present any affirmative evidence in his defense.

---

[2] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*).

[3] Because Yzararraz's appeal implicates the substantial evidence standard of review, we summarize the evidence and state the relevant facts in the light most favorable to the judgment. (*People v. Jennings* (2010) 50 Cal.4th 616, 638.)

A.    *The Gas Station Attendant's Testimony*

A.S. was the lone attendant at an Arco gas station in Perris, California on the evening of Sunday, February 2, 2020. Sometime at night before his shift ended, A.S. walked out of the gas station store to take out the trash. He then saw Yzararraz drive his silver car up to pump number nine. Instead of pumping gas or going into the gas station store, Yzararraz and his two companions just sat in the parked car, which A.S. saw as a "red flag."

At some point, Yzararraz got out of his car and began walking around the gas station parking lot. He was "getting really close" to people, although A.S. did not know if Yzararraz was "asking them questions or anything." A.S. saw that Yzararraz was wearing a gray sweatshirt and had a "P" tattoo on his face.

Sometime after Yzararraz arrived at the gas station, A.S. saw a silver or white car drive up to pump number five. The driver of that car—later identified as the victim, G.F.—got out, and Yzararraz walked up to him. As A.S. turned the corner with the trash, he heard a "really loud bang" that set off a car alarm. A.S. immediately turned around to see the victim fall. He then saw Yzararraz's car drive toward him, quickly passing A.S. as the car drove "erratically" out of the parking lot.

A.S. immediately called 911 because the victim "was shot." Sheriff's deputies got to the gas station "really quick." A.S. later identified Yzararraz as the shooter from a photograph line-up, and again in court. According to A.S., Yzararraz had been at the gas station for "20 to 30 minutes" before the shooting.

B.    *Forensic Evidence*

At 8:01 p.m. on February 2, Sheriff's deputies responded to the gas station in response to the reported shooting. They found the victim, G.F.,

4

lying on the ground, unresponsive with a single gunshot wound to his chest. Despite lifesaving measures, G.F. was pronounced dead at the scene. The forensic pathologist determined the victim's cause of death was a "perforating gunshot wound of the torso," and explained the bullet had entered "center of the chest" then travelled through his left lung, heart, aorta, and right lung before it exited through the back.

That same night, deputies found a single cigarette butt in the location where Yzararraz was seen discarding the cigarette he had been smoking at the gas station, as captured by the gas station's surveillance cameras. Forensic analysis determined Yzararraz's DNA was on the cigarette butt.

C.    *The Gas Station Customer's Testimony*

D.V. and her brother were at the gas station in a black BMW at pump number seven. While D.V. stayed in the passenger seat and her brother was outside pumping gas, D.V. saw what turned out to be the victim's car pull up to the pump next to them. As the victim got out of his car, Yzararraz—whom she described as having a lot of tattoos on his face—walked up to the victim. The men appeared to be talking but she could not hear what they were saying. She looked away and when she looked over again, Yzararraz had pulled out a gun, "aimed it" at the victim, and shot him. D.V. averted her eyes because she did not want to see what would happen next, but she heard the gunshot. When D.V. looked back again, Yzararraz was running to his car. But before Yzararraz got in his car and drove away, D.V. looked at him and he looked at her.

D.    *The Surveillance Videos*[4]

A.S. (the attendant) explained the gas station was equipped with surveillance cameras.  During his testimony, the prosecutor played two videos from the surveillance cameras for the jury.  A.S. confirmed the videos fairly and accurately depicted what he saw happened at the gas station the night of the shooting.

The first video was approximately 13 minutes and showed the front of the gas station, including the pump stations, and captured the moment Yzararraz shot the victim.  The second video was approximately five minutes and showed the side of the gas station where trucks would unload.

In the first video,[5] Yzararraz can be seen parking his silver car at pump number nine.  After he and his two passengers waited in the car for a couple of minutes, Yzararraz and one passenger got out and walked toward the front of the gas station.  Over the next few minutes, Yzararraz walked around the gas station parking lot, talking to random people.  Several customers—including D.V.'s brother—drove into the gas station and parked at various gas pumps.  Yzararraz's other passenger got out of Yzararraz's car. A couple of minutes later, Yzararraz's two passengers walked back to his car and got inside.  Meanwhile, Yzararraz finished a cigarette he had been smoking, flicked it to the ground, and walked back toward the gas pumps.

---

[4]    As we have noted, we have reviewed the surveillance videos in the record in deciding this appeal.

[5]    The surveillance videos are timestamped and the footage begins at timestamp 8:45:59 in the first video and 8:53:00 in the second video.  There was no testimony establishing the timestamps were accurate or calibrated to the correct time; we rely on the timestamps only to demonstrate the approximate lapse of time between relevant events.

Just then, the victim drove into the gas station in his silver or white car and parked at pump number five, across from the pump where D.V. and her brother were parked. The victim got out of his car. Two seconds later, Yzararraz is seen walking toward the victim. Yzararraz walked up to G.F., as G.F. walked a few steps toward Yzararraz.

Yzararraz and the victim are seen standing face-to-face, within a foot or two of one another. They appear to be talking. About 11 seconds into the conversation, Yzararraz—without any agitation or provocation apparent in the video—pulled out a handgun and aimed it at the victim's chest. One second later, Yzararraz fired the gun once into the victim's chest, at close range. Yzararraz immediately walked away toward his car, picked up his pace to a jog and then drove out of the gas station with his two companions.

## II.

### *Verdict and Sentencing*

After deliberating for just over an hour, the jury convicted Yzararraz of first degree murder (§ 187, subd. (a)) and found true he personally discharged a firearm in the commission of the murder (§ 12022.53, subd. (d)). Yzararraz later admitted his prior 2014 robbery conviction was both a serious felony (§ 667, subd. (a)(1)) and a strike prior (§ 667, subds. (c), (e)).

At his sentencing hearing on September 17, 2021, Yzararraz requested the trial court strike his strike prior under *Romero*, *supra*, 13 Cal.4th 497. The court denied his *Romero* motion, finding Yzararraz "has shown increasing violent tendencies over the course of his criminal career" and it was not in the interest of justice to strike the strike prior.

Yzararraz also requested the trial court strike the punishment on the firearm enhancement. The court denied this request too. The court expressly acknowledged it had discretion to strike the punishment on the firearm

7

enhancement under section 12022.53, but stated: "The [c]ourt is going to decline to use -- exercise its discretion and it will not strike the punishment [as it] does not believe it would be in the interest of justice to do so." For the same reasons, the trial court declined to exercise its discretion to strike the punishment on the five-year serious felony prior.

The trial court sentenced Yzararraz to a prison term of five years for the serious felony prior, followed by an indeterminate sentence of 75 years to life, consisting of 25 years to life for the first degree murder, doubled to 50 years to life because of the strike prior, plus an additional 25 years to life for the firearm enhancement.

DISCUSSION

I.

*Substantial Evidence Supported the First Degree Murder Conviction*

Yzararraz contends there was insufficient evidence of premeditation to support his conviction for first degree murder. We disagree.

In reviewing a judgment for sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine if there is substantial evidence from which any rational trier of fact could find each element of the crime beyond a reasonable doubt. (*People v. Rountree* (2013) 56 Cal.4th 823, 852–853.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence, and we resolve all conflicts in the evidence in favor of the judgment. (*People v. Jackson* (2014) 58 Cal.4th 724, 749.) We do not substitute our judgment for that of the jury or reverse merely because the evidence might also support a different finding. (*People v. Hill* (1998) 17 Cal.4th 800, 849.) "Because we must draw all inferences in support of the judgment, [a]

8

defendant 'bears an enormous burden' when challenging the sufficiency of the evidence." (*People v. Vasco* (2005) 131 Cal.App.4th 137, 161.)

The unlawful killing of a human being is presumed to be murder in the second degree, rather than the first degree. (*People v. Anderson* (1968) 70 Cal.2d 15, 25 (*Anderson*).) To support a conviction for first degree murder, the prosecution must prove the additional elements of willfulness, premeditation and deliberation. (*People v. Gomez* (2018) 6 Cal.5th 243, 282; *People v. Burney* (2009) 47 Cal.4th 203, 235 (*Burney*).) "These elements require 'more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death.'" (*Gomez*, at p. 282.) Circumstantial evidence may be sufficient to show these elements, so long as it furnishes "a *reasonable foundation* for an inference of premeditation and deliberation." (*Anderson,* at p. 25.)

"An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse." (*Burney*, *supra*, 47 Cal.4th at p. 235 [cleaned up].) But "[p]remeditation and deliberation *can* occur in a brief interval." (*People v. Memro* (1995) 11 Cal.4th 786, 863 (*Memro*), italics added.) "The test is not time, but reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." (*Id.* at pp. 862–863 [cleaned up]; accord *People v. Morales* (2020) 10 Cal.5th 76, 88 (*Morales*).)

Under the *Anderson* analysis, "a reviewing court normally considers three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but these factors need not be present in any particular combination to find substantial evidence of premeditation and

9

deliberation." (*Burney, supra*, 47 Cal.4th at p. 235 [cleaned up]; see *Anderson, supra*, 70 Cal.2d at pp. 26–27.) Further still, our high court has "reiterat[ed] that unreflective reliance on *Anderson* for a definition of premeditation is inappropriate. The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. It did not refashion the elements of first degree murder or alter the substantive law of murder in any way." (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294 (*Gonzales and Soliz*) [cleaned up].)

Moreover, "the relevant question on appeal is not whether *we* are convinced beyond a reasonable doubt, but whether *any* rational trier of fact could have been persuaded beyond a reasonable doubt that [the] defendant premeditated the murder." (*People v. Perez* (1992) 2 Cal.4th 1117, 1127 (*Perez*).) In Yzararraz's case, the clear answer to that question is yes.

As Yzararraz concedes, "[t]he evidence is essentially uncontradicted." In a rare circumstance, the victim's killing was recorded by surveillance cameras. A jury viewing the video footage could reasonably see that Yzararraz walked up to the victim[6] and—without any confrontation, provocation, or struggle—calmly pulled out a loaded gun, aimed it at the

---

6    Yzararraz argues the video evidence does not show he walked over to " 'confront' "the victim; rather it "shows the victim walking towards" him. We disagree. As we have said, we have reviewed the video evidence ourselves and conclude it contains substantial evidence from which a rational trier of fact would find that Yzararraz walked up to the victim. This is also consistent with the testimony of both the gas station attendant (A.S.) and the customer at the adjacent pump (D.V.), who each said Yzararraz walked up to the victim.

victim "center of the chest," and, without hesitation, shot him at close range. From the manner of the killing, a jury could reasonably conclude that Yzararraz's decision to kill was a cold, calculated judgment to kill, even if arrived at quickly. (*Memro*, *supra*, 11 Cal.4th at pp. 862–863; *Morales*, *supra*, 10 Cal.5th at p. 88.)

Our high court has found similar manner-of-killing evidence supportive of an inference the murder was premeditated and thus of the first degree. In *Gonzales and Soliz*, *supra*, 52 Cal.4th at page 295, the California Supreme Court found "[t]he manner of killing—a close-range shooting without any provocation or evidence of a struggle—additionally supports an inference of premeditation and deliberation." In *People v. Marks* (2003) 31 Cal.4th 197, 230, the Court concluded evidence proving "a close-range shooting without any provocation . . . or evidence of struggle" supported a conviction of murder in the first degree. And in *People v. Bloyd* (1987) 43 Cal.3d 333, 348, the Court found evidence that the victim was shot in the head "execution-style" at point-blank range, without evidence of a struggle, supported a first degree murder conviction.

Yzararraz views the evidence differently. Because the video footage shows he had "the briefest encounter" with the victim, he asserts it would be "speculation" to conclude he shot the victim with a premeditated intent to kill, rather than by "rash impulse." But although he acknowledges that "the true test is not the duration of time as much as it is the extent of the reflection" (*Morales*, *supra*, 10 Cal.5th at p. 88 [cleaned up]), Yzararraz focuses only on the brevity of his encounter with the victim to suggest his decision to kill was impulsive. He overlooks that the video footage showed that, even in the brief interval of time, he killed the victim in "a close-range

11

shooting without any provocation or evidence of a struggle." (*Gonzales and Soliz, supra*, 52 Cal.4th at p. 295.)

Yzararraz next contends the evidence showed "[t]his was a senseless killing" and not a premeditated one because there was no evidence of motive or planning by him. Rather, it was "only a chance interaction between two strangers at a gas station." But even accepting the victim's unfortunate encounter with Yzararraz was one of chance, it does not preclude the jury from reasonably finding the video footage of their interaction demonstrated that Yzararraz had the necessary period of reflection to support an inference of premeditated and deliberate intent to kill. A senseless killing can nonetheless be a premeditated one.

And while it is true the record is devoid of any evidence of motive or pre-existing relationship between Yzararraz and the victim, such evidence was not required to establish premeditation and deliberation. As our Supreme Court has repeatedly explained, "The *Anderson* factors[—including evidence of motive—]while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*Perez, supra*, 2 Cal.4th at p. 1125; accord *Gonzales and Soliz, supra*, 52 Cal.4th at p. 294.) *Anderson* does not dictate a rigid or " '[u]nreflective reliance' " on the three categories of common factors it identified. (*Gonzales and Soliz*, at p. 294; accord *Morales, supra*, 10 Cal.5th at p. 89.) Rather, it provides " 'a framework' " to assist in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations. (*Gonzales and Soliz*, at p. 294; *Morales,* at p. 89.) Here, the evidence of premeditation presented to the jury was unusual in that the murder was recorded on video. As a result, the jurors were equipped to see for themselves Yzararraz's act of killing the victim, and to conclude it

12

was the result of a cold, calculated judgment to kill. They appear to have had little trouble doing so, returning their verdict after a little more than an hour of deliberations.

Viewing the evidence in the light most favorable to the judgment, we conclude substantial evidence supported the jury's finding that Yzararraz was guilty of first degree murder.

## II.

### *Remand for Resentencing Is Warranted in Light of Salazar*

Yzararraz contends we should remand his case for resentencing, for two reasons. First, he asserts the trial court was unaware of its discretion under *Tirado, supra*, 12 Cal.5th 688—which was decided after his sentencing—to impose a lesser punishment for the firearm enhancement under section 12022.53. Second, he asserts his sentence of "80 years to life"[7] is cruel or unusual punishment in violation of the Constitutions of the United States and California. We reject his constitutional claim but remand the matter for sentencing in compliance with *Salazar, supra*, 15 Cal.5th 416.

A.    *Yzararraz's Sentence Is Constitutional*

As to Yzararraz's characterization of his sentence as cruel and unusual punishment in violation of article I, section 17 of the California Constitution

---

[7]    Although both parties refer to Yzararraz's aggregate sentence as 80 years to life, the correct description of the sentence is as we have stated: five years on the serious felony prior—which he serves first—followed by an indeterminate sentence of 75 years to life. (See § 669, subd. (a) ["Whenever a person is committed to prison on a life sentence which is ordered to run consecutive to any determinate term of imprisonment, the determinate term of imprisonment shall be served first and no part thereof shall be credited toward the person's eligibility for parole[.]"].)

13

and the Eighth Amendment of the federal Constitution, his argument misses the mark.[8]

A prison sentence violates article I, section 17 of the California Constitution if it is " 'so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*In re Nunez* (2009) 173 Cal.App.4th 709, 724–725 (*Nunez*).) Accordingly, a defendant attacking his sentence on this ground must demonstrate its disproportionality by comparing "(1) the nature of the offense and the defendant's background, (2) the punishment for more serious offenses, or (3) punishment for similar offenses in other jurisdictions." (*Id.* at p. 725; see also *Solem v. Helm* (1983) 463 U.S. 277, 284, 292 [identifying similar factors and explaining that "a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions"].) Although the defendant need not establish all three factors, he "nevertheless must overcome a 'considerable burden' to show the sentence is disproportionate to his level of culpability." (*Nunez,* at p. 725.)

Yzararraz fails to overcome that considerable burden. He was a repeat offender and was convicted of first degree murder, one of the most serious

_____

8      We need not consider Yzararraz's cursory and unsupported argument that, by virtue of its length, his sentence was an abuse of discretion. (See *People v. Clayburg* (2012) 211 Cal.App.4th 86, 93 [failure to present "reasoned argument and analysis" forfeits issue on appeal]; *People v. Sorden* (2021) 65 Cal.App.5th 582, 603 ["failure to present reasoned argument and legal authorities in support" of a claim of error forfeits issue on appeal].)

convictions available. And he committed the murder using a gun, an undeniably dangerous weapon. Accordingly, we cannot conclude that his sentence of five years plus 75 years to life, although heavy, violates the Eighth Amendment or is among the "rarest of the rare in which the punishment imposed violates . . . the California Constitution." (*Nunez, supra*, 173 Cal.App.4th at p. 725 [" '[f]indings of disproportionality have occurred with exquisite rarity in the case law' "].)

Yzararraz further complains that his lengthy sentence is the functional equivalent of a sentence of life without possibility of parole. But this fact does not somehow transform his sentence into cruel and unusual punishment violating the federal or California Constitutions. "[I]t is immaterial that [a] defendant cannot serve his sentence during his lifetime. In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life. However, imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment[.]" (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383; see also *People v. Young* (1992) 11 Cal.App.4th 1299, 1308–1311 [sentence of life without possibility of parole (LWOP) for felony murder in perpetration of robbery did not violate California Constitution]; *Harmelin v. Michigan* (1991) 501 U.S. 957 [sentence of LWOP for possession of 672 grams cocaine did not violate Eighth Amendment].) Indeed, Yzararraz fails to identify any binding authority that finds a sentence exceeding an adult defendant's possible lifetime automatically constitutes cruel and unusual punishment.[9]

---

9       Although we acknowledge Yzararraz's reliance on Justice Mosk's concurring opinion in *People v. Deloza* (1998) 18 Cal.4th 585, 600–601, that a 111-year sentence is impossible for a defendant to serve and therefore violates the federal and California Constitutions, we need not—and indeed,

B.  *In Light of Salazar, We Conclude the Record Before Us Does Not Clearly Indicate the Trial Court Would Have Imposed the Same Sentence Under an Expanded Discretionary Scheme*

In sentencing Yzararraz, the trial court imposed a consecutive term of 25 years to life for the firearm enhancement under section 12022.53, subdivision (d). At that time, the law was unsettled about whether a sentencing court had discretion to impose a lesser firearm enhancement. In *People v. Morrison* (2019) 34 Cal.App.5th 217, the First Appellate District, Division Five, held courts did have discretion to impose a lesser firearm enhancement, even one that was not alleged. (*Id.* at pp. 220, 222–223.) The Fifth Appellate District reached the opposite result in *People v. Tirado* (2019) 38 Cal.App.5th 637, holding that courts lacked the discretion to impose a lesser firearm enhancement under section 12022.53. (See also *Tirado, supra*, 12 Cal.5th at pp. 696–697 [citing cases on either side of split in authority].)

In 2022, after Yzararraz's sentencing, the California Supreme Court resolved the split. It reversed the Fifth Appellate District's decision in *People v. Tirado, supra*, 38 Cal.App.5th 637, and held that a sentencing court does have discretion to impose a lesser firearm enhancement under section 12022.53. (*Tirado, supra*, 12 Cal.5th at p. 700.) A trial court may exercise that discretion and impose the 25-years-to-life term, strike the enhancement entirely, or strike the enhancement and impose a lesser term of 10 or 20 years. (*Ibid.*)

Yzararraz asserts his case must be remanded for resentencing in light of our high court's decision in *Tirado*. Specifically, he contends it is unclear

---

cannot—follow it. Such concurring opinions lack precedential value and are not binding on this court. (See e.g. *People v. Stewart* (1985) 171 Cal.App.3d 59, 65 ["[N]o opinion has value as a precedent on points as to which there is no agreement of a majority of the court."].)

from the record whether the trial court knew at the time of his sentencing that it had discretion to impose a reduced firearm enhancement or instead, believed it had only the "binary" choice under section 12022.53, subdivision (h), of imposing the most severe enhancement or striking the enhancement entirely.[10]

The California Supreme Court in *Tirado* reaffirmed that "a defendant is entitled to decisions made by a court exercising informed discretion" when being sentenced and that "[a] court acting while unaware of the scope of its discretion is understood to have abused it." (*Tirado, supra*, 12 Cal.5th at p. 694.) However, resentencing is *not* required where "the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391 (*Gutierrez*); see also *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 [resentencing not required where "the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken a firearm enhancement"].)

In our prior opinion, we declined to remand for resentencing. We concluded the record clearly indicates that the trial court, in rejecting all possible options for reducing Yzararraz's sentence, would not have imposed a lesser sentence even had the California Supreme Court's *Tirado* decision

---

10    Section 12022.53, subdivision (h), provides in relevant part:  "The court may, in the interest of justice pursuant to [s]ection 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section."  Section 1385, subdivision (c)(1), provides that: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute."

17

been issued by the time of his sentencing.  We reasoned:  "Moreover, the trial court demonstrated—time and again through the exercise of its discretion—that it had no intention of giving Yzararraz a reduced sentence.  On the contrary, the record indicates the trial court's resolve to impose the *maximum* punishment possible, despite several avenues by which it could have imposed a lesser punishment.  Specifically, the trial court also declined to dismiss Yzararraz's firearm enhancement, his strike prior, and his prior felony, any of which would have reduced his sentence.  And the trial court indicated that it did 'not believe it would be in the interest of justice' to impose a lesser sentence."

We do not believe this analysis survives *Salazar*.  There, the high court emphasized:  "When the applicable law governing the defendant's sentence has substantively changed after sentencing, it is almost always speculative for a reviewing court to say what the sentencing court would have done if it had known the scope of its discretionary powers at the time of sentencing.  Mere reliance on the length of the original sentence and attendant decisions, such as imposing consecutive sentences, imposing middle or upper term sentences, *or declining to strike enhancements*, is not sufficient to provide a clear indication of what a sentencing court might do on remand if it had been fully aware of the scope of its discretionary powers." (*Salazar, supra*, 15 Cal.5th at p. 431, italics added.)  The court cautioned that "we cannot speculate from the court's statements and decision as to one sentencing issue to divine what the court would have done if it had broadened discretion on another sentencing issue.  Accordingly, the fact that the sentencing court denied [the defendant's] *Romero* motion tells us little about what it would have done if given the opportunity to exercise its discretion on another

18

sentencing issue under" a different sentencing statute. (*Id.* at p. 429 [cleaned up].)

The Attorney General points out that Yzararraz, in his sentencing brief, apprised the trial court of *Morrison*'s holding that it had discretion to impose a lesser firearm enhancement and, at the sentencing hearing, requested the court "strike the strike or lower the gun enhancement." In imposing the 25-years-to life term for the gun enhancement, the trial court stated it was "aware that it does have under the law the discretion *to strike the punishment* under the gun use enhancement, [section] 12022.53." (Italics added.) It did not, however, mention *Morrison* or reference its discretion to impose the lesser terms of 10 or 20 years for the gun enhancement. Thus the general rule that a trial court is presumed to have been aware of and followed the applicable law does not get us far here because we could also infer, on this silent record, the trial court chose to follow the contrary authority of *People v. Tirado*, <u>supra</u>, 38 Cal.App.5th 637.

In sum, given the lack of any other cues outside of the court's attendant decisions, including declining to dismiss Yzararraz's strike prior and prior serious felony convictions, we are unable to state the record evinces the clear indication of intent *Salazar* requires. We therefore vacate the sentence and remand for resentencing to allow the trial court to exercise its discretion under section 12022.53 to impose the 25-years-to-life term, strike the enhancement entirely, or strike the enhancement and impose a lesser term of

19

10 or 20 years.  (*Tirado*, *supra*, 12 Cal.5th at p. 700.)  We express no opinion on the outcome of the court's exercise of that discretionary authority.[11]

DISPOSITION

The sentence is vacated, and the case is remanded for resentencing consistent with this opinion.  The judgment is affirmed in all other respects.


DO, J.

WE CONCUR:


MCCONNELL, P. J.


HUFFMAN, J.

---

[11]     Yzararraz also contends that on remand, the trial court should apply Senate Bill No. 81, which amended section 1385 to enumerate factors a trial court should consider during sentencing hearings *after January 1, 2022*, in exercising its discretion to strike or dismiss a sentencing enhancement.  (Stats. 2021, ch. 721, § 1.)  Yzararraz can raise this argument with the trial court.